# IN THE SUPREME COURT, STATE OF WYOMING

# 2022 WY 158

### OCTOBER TERM, A.D. 2022

### December 19, 2022

JOSEPH R. WALKER,

Appellant
(Defendant),

v.

THE STATE OF WYOMING,

Appellee
(Plaintiff).

S-21-0045, S-22-0042

*Appeal from the District Court of Campbell County*
*The Honorable John R. Perry, Judge*

*Representing Appellant:*

Office of the State Public Defender: Diane Lozano, Wyoming State Public Defender; Kirk A. Morgan, Chief Appellate Counsel; Francis H. McVay, Senior Assistant Appellate Counsel. Argument by Mr. McVay.

*Representing Appellee:*

Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames*, Senior Assistant Attorney General; Donovan Burton, Assistant Attorney General. Argument by Mr. Burton.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.*

* An Order Allowing Withdrawal of Counsel was entered on August 1, 2022.

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**GRAY, Justice.**

[¶1]    Joseph Walker was charged with five counts of third-degree sexual abuse of a minor and one count of attempted second-degree sexual abuse of a minor (Count VI) for acts that occurred between January 19, 2020, to February 9, 2020.  At trial, the jury instructions contained identical language for the basis of conviction on Counts I through V.  The jury found Mr. Walker guilty of Counts I, II, III, and VI, but acquitted him of Counts IV and V.  Mr. Walker appeals his convictions on Counts I, II, III, and VI, claiming the jury instructions were insufficient to direct the jury to a unanimous verdict on each count.  We affirm Mr. Walker's convictions on Counts I and VI, and reverse his convictions on Counts II and III.

*ISSUE*

[¶2]    Were the jury instructions plainly erroneous because they did not differentiate between the five counts of third-degree sexual abuse of a minor, inviting the possibility of juror confusion?

*FACTS*

**A.    Events Leading to the Charges**

[¶3]    In January 2020, 34-year-old Mr. Walker moved in with the R family.  Mr. and Mrs. R lived in Campbell County with their children, KR (female 15), FR (female 13), AR (female 11), MR (female 9), and DR (male 4).  On February 9, 2020, Mrs. R was at the mall with 11-year-old AR when AR told her mother that about a week earlier KR had confided that "something happened" with Mr. Walker in KR's bedroom.  Mrs. R immediately returned home to talk to KR, who told her that Mr. Walker had inappropriately touched her on more than one occasion.  Mrs. R took the two girls to the Campbell County Sheriff's Department.

[¶4]    Sergeant Janaia Hyland, the head of the investigation division, accompanied by Investigator Josh Knittel took Mrs. R's report.  After speaking with Mrs. R, Sergeant Hyland interviewed KR alone for "roughly, an hour."  KR disclosed Mr. Walker had touched her vaginal area five to ten times in her bedroom.  KR stated the first time he touched her was about a week to two weeks after Mr. Walker moved into the R home, and that the last time was approximately two weeks before the interview.  KR also reported that on one occasion Mr. Walker attempted to place his face on her vagina, but she pushed him away and ran out of the bedroom.

[¶5]    Following these interviews, Sergeant Hyland and Investigator Knittel located Mr. Walker, and he agreed to accompany them to the station.  At the station, Mr. Walker denied

1

the allegations.  Investigator Knittel placed Mr. Walker under arrest for third-degree sexual abuse of a minor, and Mr. Walker was transported to the detention center.

## B.      The Charges

[¶6]    A Felony Information was issued on February 11, 2020, charging Mr. Walker with six counts of third-degree sexual abuse of a minor in violation of Wyo. Stat. Ann. § 6-2-316(a)(i).  Counts I through VI initially contained identical language:

> On or between January 19, 2020, to February 9, 2020, in Campbell County, Wyoming, under circumstances not constituting sexual abuse of a minor in the first or second degree as defined by Wyoming Statutes § 6-2-314 and § 6-2-315, engaged in sexual contact with a victim who was thirteen (13) through fifteen (15) years of age and the actor being seventeen (17) years of age or older with the victim being at least four (4) years younger than the actor, **Third Degree Sexual Abuse of a Minor**, in violation of Wyoming Statute § 6-2-316(a)(i), a felony, punishable under Wyoming Statutes § 6-2-316(b) and § 6-10-102, by imprisonment for not more than fifteen (15) years, to which a fine of not more than $10,000.00 may be added;

[¶7]    Count VI was later amended from third-degree sexual abuse of a minor to attempted second-degree sexual abuse of a minor.  The amended count stated:

> On or between January 19, 2020, to February 9, 2020, in Campbell County, Wyoming, with intent to commit a crime, did an act which was a substantial step towards the commission of the crime, under circumstances not constituting sexual abuse of a minor in the first or second degree as defined by Wyoming Statutes § 6-2-314 and § 6-2-315, did attempt to inflict sexual intrusion on a victim who was thirteen (13) through fifteen (15) years of age, and the actor being seventeen (17) years of age or older with the victim being at least four (4) years younger than the actor, **Attempted Second Degree Sexual Abuse of a Minor**, in violation of Wyoming Statute § 6-2-315(a)(i) and § 6-1-301(a)(i), a felony, punishable under Wyoming Statutes § 6-2-315(b) and § 6-10-102, by imprisonment for not more than twenty (20) years, to which a fine of not more than $10,000.00 may be added.

2

[¶8]    Mr. Walker filed a Motion for Bill of Particulars, arguing that the charging document was legally insufficient.[1] He argued that the absence of any distinguishing facts between Counts I through V prevented him from preparing an adequate defense and denied him a unanimous jury verdict because "one juror could convict on one instan[ce] of touching believing it was Count [I], while another juror could believe that [the same] occurrence applied to a different count[.]"  The district court granted Mr. Walker's motion.

[¶9]    The State responded:

> The most logical way to differentiate Counts I–V, because the behavior of Mr. Walker is so similar between occasions, would be to call the events first, second, third, etc. That will allow the jury to differentiate the counts. Theoretically a jury member could say as to Count I that Mr. Walker is Guilty of Third-Degree Sexual Abuse for the second time he entered her room [Mr. Walker's first entry was not charged] but not guilty for the third, fourth, fifth, and sixth time.

---

[1] The content of a felony information is governed by W.R.Cr.P. 3(b)(2) which states in relevant part:

> **(b)    Nature and contents.—**
>     .   .   .
> (2)    *Information.—*The information shall be a plain, concise and definite written statement of the essential facts constituting the offense charged. *When multiple counts are involved, the facts must be stated with sufficient particularity so as to allow the defendant and court to distinguish between the various counts.*  It shall be signed by the attorney for the state.  It need not contain a formal commencement, a formal conclusion or any other matter not necessary to such statement.  Allegations made in one count may be incorporated by reference in another count.  It may be alleged in a single count that the means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means.  The information shall state:
>> (A)    The name of the court where it was filed;
>> (B)    The names of the state and the defendant if the defendant is known, and, if not, then any names or description by which the defendant can be identified with reasonable certainty; and
>> (C)    For each count the official or customary citation of the statute, rule, regulation or other provision of law which the defendant is alleged therein to have violated.

W.R.Cr.P. 3(b)(2) (emphasis added).  The italicized language was added March 24, 2020, effective July 1, 2020, and was not part of the rule in effect when Mr. Walker was charged.

3

The State filed a Bill of Particulars on May 15, 2020, and the matter proceeded to trial on September 9, 2020.

## C. The Trial

[¶10] At trial, the State called five witnesses. Mrs. R testified to the events leading to her discovery of KR's allegations, the subsequent report to law enforcement, and FR's frequent overnight visits with a friend during the time the acts occurred. AR testified about KR telling her what happened and "blurt[ing] . . . out" the secret to her mother. FR testified that during the relevant timeframe, she spent weekends and Monday and Tuesday nights at a friend's house. Sergeant Hyland testified about the steps in her investigation and her interview of KR. In the interview, KR divulged that Mr. Walker had entered her bedroom between five and ten times and had placed his hand on her vagina outside of her panties. Sergeant Hyland stated KR appeared calm during the interview, was responsive to questions, and was able to track what happened and how it occurred. KR estimated it was over a week, between a week and two weeks, after he moved into the R home that Mr. Walker began to touch her, and these episodes ended approximately two weeks before the interview. The final evidence introduced was the stipulated testimony of Investigator Knittel. The district court read Investigator Knittel's affidavit where he attested that he sought and was granted a search warrant for Mr. Walker's cell phone and that after extracting the information, nothing of evidentiary value was found.

[¶11] The only evidence of what occurred between KR and Mr. Walker came through KR's testimony. Because the jury necessarily relied on KR's testimony for the factual basis for each charge, we set forth her testimony in detail.

### 1. Direct Examination:

Q. What's the first interaction you remember having with Mr. Walker?
A. Well, he sat – I was, like, in the living room, messing with my phone or tablet, and he sat right beside me, where I – [o]n the couch, and he started to talk to me and I didn't know really what to say that much, so . . . .
Q. Now, after that interaction in the living room, did you have interaction with him again?
A. Yes, sir.
Q. [A]nd where was that at?
A. My room.
Q. [W]hat were you doing in your room?
A. Messing around with my phone.
Q. . . . . Were you going to bed or were you just hanging out in your room?

4

A. I was just hanging out in my room.

Q. [W]hat happened?

A. Well, he sat in the corner of my bed and started talking, trying to get to know me and then he started, like petting me on the stomach, around my chest. He didn't actually touch; he just rubbed around.

. . . .

Q. And about how long after he moved in did that happen?

A. I think it was, like, a week or something.

Q. . . . . And was that the only time [he] came into your room?

A. No. . . . [I]t isn't.

Q. So let's talk about the second time he came into your room, if we can. What were you doing in your room?

A. Messing around with my phone, like . . . .

Q. Was it the middle of the day? The night? Or what was it?

A. I don't really remember the time, but I know I was just messing around with my phone, laying down. . . .

Q. And what happened?

A. Um, he started touching again, started telling me, like, he wanted to be part of the family . . . .

Q. And the second time he came into the room, where was he touching you that time?

A. I'm pretty sure he was touching me in the privates, you know, rubbing on me still.

Q. [A]nd when you say your privates, what part are you talking about?

A. Um, like, this area. (Indicating.)

Q. [Y]our vagina?

A. Yes, sir.

Q. [W]hat part of his body was he using to touch your vagina?

A. His hands. . . .

Q. [W]hen you spoke to Sergeant Hyland, I think you said that you think this happened 5 to 10 times; is that right?

A. Yes, sir.

Q. . . . . And was the . . . third time he came into your room, was it basically like the second?

A. Yeah. I'm pretty sure. . . .

Q. So when you say you think he touched your vagina –

A. No, I mean, like, I think that the third day he may or – like, he – I don't know if it was the, like, third day or the fourth

5

day he'd gone far, but, like, that's what I'm saying. . . . [B]ut I know for a fact he did.

Q. [W]as there a time where he tried to touch you with something other than his hands in your private?

A. Oh, well, he tried to put his face up to it.

Q. Did he say anything?

A. Yes.

Q. What did he say?

A. He said, Can – can I please come eat you[?]

Q. . . . . And did you take that to mean to lick your vagina?

A. Yes, sir.

Q. [T]ell us what happened there.

A. I started to – he started getting really close, and I started pushing him away. Then I got up and ran in the kitchen, I think, or in the living room. . . .

Q. [H]ow close did his face get to your vagina.

A. Like, right here. (Indicating.)

Q. Just a few inches away?

A. Yes, sir.

Q. . . . . Did he do anything with your clothing at that time?

A. . . . I guess he tried to, like, take the flap, or whatever it's called, off. . . .

Q. [H]e just tried to move it to the side?

A. Yes, sir. . . .

Q. [T]he time that Mr. Walker came into your room and tried to move your underwear to put his face down there, was that in your room as well?

A. Yes, sir.

Q. And you were in bed?

A. Yes, sir.

Q. [W]as that one of the times that he also touched you with his hands[?]

A. Yeah, but, not, like, while doing it.

Q. Not like what?

A. Not while – like – not while he put his face under there, but, like, he – he tried to, like, move my underwear, but, like, he didn't try to – he did it before he –

Q. Okay. So he touched . . . your vagina with his hand before he tried to . . . put his face down there.

A. Yes.

Q. [W]as that the last time or one of the last times that he went into your room?

A. No. . . . I'm pretty sure.

Q.     [S]o you've said that the third time was . . . like the . . . second time where he came in and touched your vagina with his hands over your clothes[?]

A.     Actually, I think I was in my underwear at the time. . . . I think, like, the first day I had pants on, so he couldn't really do anything.

Q.     [T]he first time he touched your vagina area you had pants on?

A.     No, I don't think so.

Q.     . . . . The first time when he rubbed your stomach and . . . didn't actually touch any of your intimate parts, you think you were wearing pants?

A.     Yes.

Q.     . . . . And after that, you think that you were wearing panties?

A.     Yes, sir.

Q.     . . . . And the . . . fourth and fifth time that he went into your room, were you, again, in bed?

A.     Yes, sir.

Q.     [W]hat did he do those times?

A.     I'm pretty sure he did the same thing as, like, the second one and third one. The fourth day . . . I'm pretty sure on the fifth day he started to take his clothes off.

Q.     . . . . So the fifth time he came in, you noticed he started to take his clothes off?

A.     Yes, sir.

Q.     What did he take off?

A.     Pretty sure he took off his shirt and pants and that was it. But I didn't really know, because I was, like, laying down, and . . . I was too afraid to get up at the time, because I didn't know if he was naked or not, so. It took me a while before I got up and ran.

Q.     . . . . And everything you've talked about happen[ed] at your house[?]

A.     Yes, sir.

## 2. Cross Examination:

Q.     Would you agree that if [Mr. Walker] moved in on January 12th, after that first week sometime is when he started talking to you? Is that correct? . . .

A.     Yes, sir.

7

Q.     So somewhere, then, January 19th or later. Is that a fair statement?

A.     Yes, sir. . . .

Q.     [D]o you recall telling law enforcement that it was a week or two after that discussion with Mr. Walker that he touched you for the first time?

A.     Yes, sir.

Q.     So would you agree that that date would have been about January 26th, at the earliest?

A.     Yes, sir.

Q.     And, again, that first time he touched you, I believe you told [the prosecutor] you were wearing sweats, didn't touch you in your private areas[?]

A.     Yes, sir. . . .

Q.     [D]o you recall telling law enforcement that the first time he touched you inappropriately was the day after the first time he touched you[?]

A.     Yes, sir.

Q.     [S]o would you agree that the earliest that he could have touched you inappropriately would have been January 27th, based upon the timeline you gave to law enforcement?

A.     Yes, sir. . . .

Q.     The first time he touched you inappropriately, . . . when was the next time he touched you inappropriately?

A.     It was either the next day or the day before. I'm pretty sure.

Q.     [D]o you mean the day after?

A.     Yeah.

Q.     . . . . So we're talking, maybe, the 28th or 29th was the second time you were touched inappropriately?

A.     Yes.

.     .     .

Q.     When did the third inappropriate touching occur?

A.     Pretty sure [the] next day or the day after.

Q.     [W]as that any different than the first, second, or third time?

A.     No.

Q.     When did the fourth time he touched you inappropriately occur?

A.     Same thing.

Q.     [N]ext day or two?

A.     Next day or two, yeah. . . .

8

Q.    Now, the time he tried to go down on you, when did that event occur?
A.    Either [on] the last or fourth day.

.    .    .

Q.    [D]o you recall telling law enforcement that this happened between 5 and 10 times?
A.    Yes, sir.
Q.    Do you know how many times this did happen?
A.    I'm pretty sure it's five or six.
Q.    . . . . Why are you pretty sure it's five or six?
A.    Because, um, I didn't really – I don't really know how many times he did it.  I just know he kept on doing it every day.
Q.    So is it fair to say you know he did it more than once?
A.    Yes, sir.
Q.    Beyond that, how certain are you it wasn't four times?
A.    Um, 'cuz – I mean, it could have been four.
Q.    Could it have been three?
A.    No.  I just know it's more than three.

### 3. Redirect Examination:

[¶12]  On redirect, KR testified she wasn't really being exact.  She stated she struggles with time concepts and is on an individualized education program in which she "ha[s] to keep a calendar at school in case, like, I forget."

## D.    The Instructions and Verdict

[¶13]  The district court and the attorneys reviewed the instructions after the close of the evidence.  There were no substantive changes and no objections.  The instructions relevant to the issue here stated as follows:

### 1. Jury Instruction No. 4:

It is your duty to follow the law as stated in these instructions and to apply the law to the facts as you find them from the evidence presented during the trial.

.    .    .

It is your responsibility to evaluate the evidence and determine the facts of this case.  In finding the facts, you must consider all of the evidence presented and only the evidence.

9

You may not assume, suppose, speculate or otherwise guess as to what the facts might have been, even if you consider the evidence confusing or incomplete; however, in considering the evidence you may draw reasonable inferences based on your general knowledge, observations and experience in the affairs of life.

. . .

In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

## 2. Jury Instruction No. 5:

In order to convict the Defendant of any crime charged, every element which constitutes that crime must be proved by the State beyond a reasonable doubt. If there is any reasonable doubt as to any element to constitute that crime, the Defendant must be given the benefit of the doubt and must be found not guilty of that crime.

. . .

The burden is always on the State to prove the Defendant's guilt beyond a reasonable doubt as to each element of each crime charged.

## 3. Jury Instruction No. 7:

The Defendant has been charged in this case with six counts in the Information. Each count and the evidence pertaining to it, should be considered separately by the jury. The fact that you may find the Defendant guilty or not guilty as to a crime charged in one count of the Information should not control your verdict as to any other crime charged in any other count.

## 4. Jury Instruction No. 8:

The elements of Third Degree Sexual Abuse of a Minor as charged in **Count I** are:
1.      on or between January 19, 2020, and February 9, 2020;
2.      in Campbell County;
3.      the [D]efendant, Joseph R.Walker;

4.       who was 17 years of age or older;

5.       engaged in sexual contact with [KR];

6.       [KR] was 15 years of age at the time of the sexual contact; and

7.       [KR] was at least four years younger than the Defendant.

If you find from your consideration [of] all the evidence that each of these elements has been proved beyond a reasonable doubt, then you should find the Defendant guilty. If, on the other hand, you find from your consideration of all of the evidence that any of these elements has not been proved beyond a reasonable doubt, then you must find the Defendant not guilty.

(Emphasis added.) The instructions on Counts II, III, IV, and V—the additional charges of third-degree sexual abuse of a minor—contained identical language to Jury Instruction No. 8 for Count I except for the count number.

## 5. Jury Instruction No. 14:

The charges against the Defendant state that the crimes alleged occurred on or between certain dates. The State must prove beyond a reasonable doubt that the crimes alleged occurred approximately between those dates. It is not necessary that the State prove the crimes alleged occurred specifically between those dates to the exclusion of all other dates.

## 6. The Verdict Form:

The verdict form listed each count of third-degree sexual abuse of a minor followed by:

We, the jury, duly empaneled and sworn to try the above-entitled cause, as to the crime of Third Degree Sexual Abuse of a Minor, as charged in Count [____], find the defendant, Joseph R. Walker:

_____Guilty

_____Not Guilty

[¶14] After deliberations began, the jury submitted a question to the court asking if it was possible to view the Facebook messages AR received from Mr. Walker. The substance of the message was not admitted at trial. The court responded, "No. You must decide the

case on the evidence you have before you." There was no further communication with the jury until it reached its verdict.

[¶15] The jury found Mr. Walker guilty of Counts I, II, III, and VI, and not guilty of Counts IV and V. The district court sentenced Mr. Walker to seven to ten years imprisonment on each of Counts I, II, and III to run concurrently. It sentenced him to ten to twelve years imprisonment on Count VI to run consecutive to the sentence in Counts I, II, and III.

## DISCUSSION

***Were the jury instructions plainly erroneous because they did not differentiate between the five counts of third-degree sexual abuse of a minor, inviting the possibility of juror confusion?***

[¶16] Mr. Walker appeals from his conviction on Counts I through V, claiming the lack of specificity in the jury instructions and the verdict form denied him a fair trial. Mr. Walker did not object to the jury instructions or the verdict form.

## STANDARD OF REVIEW

[¶17] As stated in *Farrow v. State*:

> The district court "has extensive discretion in tailoring jury instructions, so long as they correctly state the law and fairly and adequately cover the issues presented." *Merit Energy, Co., LLC v. Horr*, 2016 WY 3, ¶ 23, 366 P.3d 489, 497 (Wyo. 2016). "Accordingly, our review of a district court's decision to give or refuse a particular jury instruction is for an abuse of discretion." *Id.* When there is no objection to a jury instruction, however, we must review for plain error. *Schmuck v. State*, 2017 WY 140, ¶ 32, 406 P.3d 286, 297 (Wyo. 2017).

*Farrow v. State*, 2019 WY 30, ¶ 12, 437 P.3d 809, 815 (Wyo. 2019). Under plain error review:

> First, the record must clearly present the incident alleged to be error. Second, appellant must demonstrate that a clear and unequivocal rule of law was violated in a clear and obvious, not merely arguable, way. Last, appellant must prove that he was denied a substantial right resulting in material prejudice against him.

12

*Leyva v. State*, 2005 WY 22, ¶ 9, 106 P.3d 873, 876 (Wyo. 2005) (quoting *Ogden v. State*, 2001 WY 109, ¶ 9, 34 P.3d 271, 274 (Wyo. 2001) (quoting *In Int. of CB*, 749 P.2d 267, 268–69 (Wyo. 1988))).

We also apply the following standard:

> . . . Jury instructions must be considered as a whole, and individual instructions, or parts of them, should not be singled out and considered in isolation. We confine our review to a search for prejudicial error. As long as the instructions correctly state the law and the entire charge covers the relevant issue, reversible error will not be found.
>
> *Creecy v. State*, 2009 WY 89, ¶ 18, 210 P.3d 1089, 1093 (Wyo. 2009) (internal punctuation omitted). "Jury instructions shall not be ruled defective absent a showing that the instructions confused or misled the jury as to the proper principles of law and prejudiced the defendant." *Baker v. State*, 2010 WY 6, ¶ 31, 223 P.3d 542, 555 (Wyo. 2010).

*Gentilini v. State*, 2010 WY 74, ¶ 17, 231 P.3d 1280, 1285 (Wyo. 2010).

### *ANALYSIS*

[¶18] "Article 1, Section 9 of the Wyoming Constitution recognizes the right of an accused to receive a unanimous verdict by twelve impartial jurors."[2] *Vargas-Rocha v. State*, 891 P.2d 763, 770 (Wyo. 1995) (citing *Brown v. State*, 817 P.2d 429, 439 (Wyo. 1991)). Fundamental problems arise when a defendant is charged with identical, nonspecific counts. *Morones v. State*, 2020 WY 85, ¶¶ 15–18, 466 P.3d 300, 305–06 (Wyo. 2020); *Heywood v. State*, 2007 WY 149, ¶ 30, 170 P.3d 1227, 1235 (Wyo. 2007), *abrogated on other grounds by Granzer v. State*, 2008 WY 118, 193 P.3d 266 (Wyo. 2008).

> If identical counts are carried on to the jury instructions and the resulting jury verdict, there is a danger that the jury may convict a defendant although not reaching a unanimous agreement on precisely which charge is the basis for the

---

[2] At the time of Mr. Walker's trial, the Supreme Court had not specifically applied the unanimity requirement of the Sixth Amendment to state trials. On April 20, 2020, the Supreme Court issued its opinion in *Ramos v. Louisiana*, 590 U.S. —, —, 140 S.Ct. 1390, 1397, 206 L.Ed.2d 583 (2020), holding that "[t]here can be no question . . . that the Sixth Amendment's unanimity requirement applies to state and federal criminal trials equally[,]" overruling *Apodaca v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972).

conviction in violation of the Sixth Amendment guarantee to a unanimous jury verdict.

*Roberts v. State*, 2022 WY 93, ¶ 19, 513 P.3d 850, 854–55 (Wyo. 2022) (citations and quotation marks omitted).

[¶19] Mr. Walker contends the record clearly reflects that the jury was not properly instructed because the unequivocal law requires the instructions "leave no doubt as to the circumstances under which the crime can be found to have been committed." *Mueller v. State*, 2001 WY 134, ¶ 9, 36 P.3d 1151, 1155 (Wyo. 2001) (citations omitted); *Leyva*, ¶ 9, 106 P.3d at 876; *Heywood*, ¶¶ 17–33, 170 P.3d at 1232–36. He claims the identical instructions on five counts of third-degree sexual abuse of a minor had the effect of permitting the jury to convict him for the several crimes that were charged even though different jurors might have found him guilty of the same act but on a different day. He contends that this result would deprive him of the unanimous verdict to which he is entitled.

[¶20] The State concedes prong one of plain error in that the alleged error is clearly reflected in the record. The State disagrees that the court violated a clear and unequivocal rule of law. The State argues the manner in which the State presented evidence and the State's closing argument informed the jury that Counts I through V refer to the first five incidents of sexual contact in sequential order. The State further argues that the jury verdict was not contrary to the evidence presented at trial.

[¶21] We agree with the parties that the first prong of plain error has been met and proceed to the second prong.

## A.    Clear and Unequivocal Rule of Law

[¶22] Under plain error, Mr. Walker "must demonstrate that a clear and unequivocal rule of law was violated in a clear and obvious, not merely arguable, way." *Six v. State*, 2008 WY 42, ¶ 12, 180 P.3d 912, 917 (Wyo. 2008) (quoting *Leyva*, ¶ 9, 106 P.3d at 876); *Connolly v. State*, 610 P.2d 1008, 1011 (Wyo. 1980).

> [W]e test the instructions using the following principles:
>
> > The purpose of jury instructions is to provide the jury with a foundational legal understanding to enable a reasoned application of the facts to the law. In order to support a reliable verdict, it is crucial that the trial court correctly state the law and adequately cover the relevant issues. Ultimately, the test of adequate jury instructions is whether they leave no doubt as to the circumstances

under which the crime can be found to have been committed.

*Blevins v. State*, 2017 WY 43, ¶ 26, 393 P.3d 1249, 1255 (Wyo. 2017) (citations and quotation marks omitted).

[¶23]   Mr. Walker relies primarily on our decisions in *Heywood*, ¶¶ 17–33, 170 P.3d at 1232–36,[3] and *Morones*, ¶¶ 17–20, 466 P.3d at 305–07.

[¶24]   In *Heywood*, the defendant was charged with three counts of second-degree sexual assault.  *Heywood*, ¶ 5, 170 P.3d at 1229.  The information, jury instructions, and verdict form used identical language for each of the three counts.  *Id.* ¶¶ 21, 24, 170 P.3d at 1232–34.  During jury deliberations, the jury sent a question to the trial court asking:

> Are the three counts—
> 1.  In the shed?
> 2.  Use of the sex toys?
> 3.  When removing the splinter?

*Id.* ¶ 18, 170 P.3d at 1232.

[¶25]   The court responded: "The [c]ourt is unable to further instruct on this.  You must rely on your recollection of the evidence and argument and consider the Instructions."  *Id.* ¶ 19, 170 P.3d at 1232.

[¶26]   On appeal, the question before the Court was whether the district court's failure to further instruct the jury was plain error.  To answer this question, we considered the basic tenets concerning jury instructions, stating:

> It is possible, perhaps probable, that *the parties* knew what particular incidents formed the bases for these allegations.  But that is not sufficient.  *The jury* must be adequately instructed to allow it to apply the law to the facts. . . .

---

[3] Earlier cases referred to erroneous instructions as a "fundamental error."  *See, e.g.*, *Heywood*, ¶ 26, 170 P.3d at 1234 ("[A] failure to give an instruction on an essential element of a criminal offense is fundamental error, as is a confusing or misleading instruction[.]" (quoting *Leyva*, ¶ 8, 106 P.3d at 876)).  In *Granzer*, we clarified that "a trial court's failure to instruct on an element of a crime is not a structural or fundamental error, but rather a trial error" subject to review under the harmless-error standard or the plain-error standard.  *Granzer v. State*, 2008 WY 118, ¶ 18, 193 P.3d 266, 271–72 (Wyo. 2008).  Under the plain-error standard, "failure to instruct on an essential element is not reversible if the element was not contested or 'where evidence of the defendant's guilt is overwhelming' because, under those circumstances, the defendant suffers no prejudice from the violation."  *Id.* ¶ 21, 193 P.3d at 272 (quoting *Miller v. State*, 904 P.2d 344, 349 (Wyo. 1995)).

> **[T]he test of whether a jury has been properly instructed on the necessary elements of a crime is whether the instructions leave no doubt as to the circumstances under which the crime can be found to have been committed.**

*Id.* ¶ 26, 170 P.3d at 1234 (first emphasis added) (quoting *Leyva*, ¶ 8, 106 P.3d at 876).

[¶27]   We noted that the record contained no indication that the jury was ever informed which charge related to which location, although the testimony centered on three incidents. We concluded that the jury question:

> facially reflect[ed] the jury's confusion. Instruction No. 3 informed the jury that "[e]ach count is a separate charge, and the proof as to each must stand on its own, so you must separately consider and determine what the evidence shows as to each count." It is easy to surmise that, as the jury began its deliberations, it had no idea what the allegation in count I (or count II or count III) was, and therefore asked the judge for guidance. The judge's answer—"I can't tell you"—was inadequate.

*Id.* ¶ 27, 170 P.3d at 1234–35.   We found that the district court committed prejudicial error in failing to provide a substantive answer to the jury's question. *Id.* ¶ 30, 170 P.3d at 1235. We said, "Even without that error, the instructions were inadequate. The fundamental problem is that, contrary to law, we are left in doubt as to the circumstances under which a crime was found to have been committed under any of the three counts." *Id.*

[¶28]   In *Morones*, the defendant was charged with two counts of strangulation of a household member and one count of driving while under the influence.

> During opening statements, the State distinguished between the two strangulation charges chronologically stating, "[t]he evidence and testimony that will be presented . . . will corroborate [the victim]'s account of the events and how . . . [Mr.] Morones, put his hands on [the victim]'s neck on two separate occasions, once before she reached the Snowy Range Bridge and once while she was on the Snowy Range Bridge." The defense likewise described the incidents chronologically in opening statements, the first outside the bowling alley and the second on the bridge. Throughout the trial, both parties continued to refer to the incidents in a chronological fashion

16

> referring to the incident outside the bowling alley as first, and
> the incident on the bridge as second.

*Morones*, ¶ 6, 466 P.3d at 303.

[¶29]   The jury's instructions and verdict form contained identical language for each of the two strangulation charges.  The jury found the defendant not guilty on the first count of strangulation of a household member, guilty on the second count of strangulation of a household member, and guilty of driving while under the influence.  *Id.*

[¶30]   On appeal from his strangulation conviction, the defendant did not challenge the jury instructions or the verdict form.  Though the defendant did not raise this issue, we were required to address it because an analysis of his sufficiency of the evidence claim required the Court to determine which of the two charges was at issue.  *Id.* ¶ 15, 466 P.3d at 305.

[¶31]   After reviewing our holding in *Heywood*, we said:

> The foregoing principles of law can be summarized for present
> purposes as follows: (1) instructions that leave doubt as to the
> circumstances under which the crime was committed are
> insufficient; (2) instructions that confuse or mislead the jury
> are insufficient; (3) jury questions revealing confusion or a lack
> of understanding should be answered.

*Morones*, ¶ 17, 466 P.3d at 306 (quoting *Heywood*, ¶ 29, 170 P.3d at 1235).

[¶32]   We distinguished the facts in *Morones* from the facts in *Heywood* observing "there was no unanswered jury question, and it does not appear the jury was confused.  The parties consistently described the events in a sequential fashion describing the incident outside the bowling alley as first, and the incident on the bridge as second."  *Morones*, ¶ 18, 466 P.3d at 306.  Although we did not address the issue further, we cautioned "the State and district courts to be mindful of the need for specificity in cases involving multiple counts of the same crime[,]" *id.*, and noted that "[t]he clarity of counsel's statements alone is likely insufficient to compensate for inadequate jury instructions."  *Id.* ¶ 18, 466 P.3d at 306 n.2 (citing *Flores v. State*, 2017 WY 120, ¶ 11, 403 P.3d 993, 995 n.3 (Wyo. 2017)).

[¶33]   We discussed a similar situation in another child sexual abuse case, *Alicea v. State*, 13 P.3d 693, 699–700 (Wyo. 2000), *overruled on other grounds by Jones v. State*, 2019 WY 45, 439 P.3d 753 (Wyo. 2019).  There, the two victims were unable "to recall with much specificity dates, or even general time frames, for the occurrences of the various sexual encounters with [the defendant]."  The victims' testimony was confounded by the

prosecutor's "difficulty in phrasing her questions" and the court's "frequent[]" interjections. *Id.* at 699.

> Instruction Nos. 2–6 listed the elements of each of the six counts charged. Included among those elements were dates. Most of the "time" elements of those instructions were stated as being between a period of months, *e.g.*[,] "between the time period of October 1990, through May 1991," "February 1992 through March 1992," and "during the summer of 1993." That portion of those instructions was modified by Instruction No. 10:
>
>> Even though you have been instructed that the State must prove beyond a reasonable doubt that a crime was committed within a specified time frame, the failure to establish with precision that the crime occurred within that time frame is not fatal, especially in the case of alleged abuse to children. A witness'es [sic] inability to recall specific time frames may be taken into account in weighing the credibility of any witness, along with those factors mentioned in the last paragraph of instruction No. 1.

*Id.*

[¶34] As recognized in our earlier holdings, a "specific date is not a required element of the crime," and "alleging a general time period, in lieu of a specific date, is sufficient to give a defendant notice and allow him to adequately prepare a defense." *Alicea*, 13 P.3d at 700 (citing *Vernier v. State*, 909 P.2d 1344, 1350–52 (Wyo. 1996); *Jackson v. State*, 891 P.2d 70, 75 (Wyo. 1995)). However, we were "unable to stretch the spirit, as well as the letter, of those cases to fit the use of Instruction No. 10" because that instruction made "it impossible to differentiate between Count I and Count II, between Count III and Count IV, or between Count V and Count VI, because the elements of each of those pairs became exactly the same as a result of the challenged instruction." *Alicea*, 13 P.3d at 700. We determined "[i]t [was] as likely as not that the jury may have found [the defendant] guilty twice for the exact same act." *Id.* We disapproved of the instruction and found that its use in that case necessitated reversal. *Id.*

[¶35] In this case, it is apparent that the jury instructions and the verdict form contained no language that would distinguish between the crimes charged in Counts I, II, III, IV, and V for the jury. Instruction No. 4 directed, "In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous." This instruction did not clarify that the jury must unanimously agree on the specific incident that formed the basis of the

verdict. One juror could believe that the third time Mr. Walker came into the bedroom was the second time he inappropriately touched her, but another juror could believe the second inappropriate touching was the fourth or fifth time Mr. Walker came into the room. The instructions as a whole, including the verdict form, were plainly insufficient to establish the level of unanimity required for Mr. Walker's conviction on five identical counts.[4]

[¶36] The State argues that merely submitting identical instructions for several counts of the same charge does not necessarily render the instructions erroneous. To support its argument, the State points to our decision in *Gentilini*, ¶¶ 16–26, 231 P.3d at 1285–88. In *Gentilini*, the defendant was convicted of attempted first-degree murder and aggravated assault. Relevant to the case before us, he asserted:

> [T]he instructions were insufficient because they did not identify which of his actions constituted the crime of attempted first degree murder. He contends the jury could have used either the act of attempting to run over Mr. Ellsworth with the car, or the act of retrieving his gun, as a basis for finding him guilty of the attempted murder charge.

*Gentilini*, ¶ 21, 231 P.3d at 1287. During deliberations, the jury asked, "Specifically does the aggravated assault charge . . . refer solely to the automobile or does it refer to the rifle as well?" The court responded: "The aggravated assault charge only relates to the automobile." *Id.* ¶ 23, 231 P.3d at 1287.

[¶37] We affirmed Mr. Gentilini's conviction distinguishing our holding in *Heywood* because the district court answered the jury's question, removing any potential confusion. *Id.* ¶ 22, 231 P.3d at 1287. We noted the trial transcript, closing arguments, and the answer to the jury's question supported the conclusion that there was "no violation of a clear and unequivocal rule of law." *Id.* ¶ 25, 231 P.3d at 1288; *see also Metzger v. State*, 4 P.3d 901, 908–10 (Wyo. 2000) (Where instructions as to charge and element were the same, trial court committed no error because: the jury was instructed to consider the charges individually; the verdict form required the jury to make separate findings as to each count; the testimony given by EM clearly described two separate incidents; and Metzger failed to offer more accurate instructions.).

[¶38] The State contends that, as in *Gentilini*, KR's testimony and the State's closing argument presented the jury with sufficient sequential factual basis for each charge. It

---

[4] The Bill of Particulars is irrelevant to our analysis here. "The function of a bill of particulars is 'to make more specific the general allegations in the information to enable the defendant to prepare his defense and avoid being surprised at the trial.'" *Heywood v. State*, 2009 WY 70, ¶ 5, 208 P.3d 71, 72 (Wyo. 2009) (*Heywood II*) (quoting *Booth v. State*, 517 P.2d 1034, 1036 (Wyo. 1974)). Mr. Walker does not claim he was unable to prepare his defense, and the record is devoid of any suggestion that the jury was aware of the existence of a Bill of Particulars.

argues that, because nothing in the record indicates any confusion on the part of the jury and the verdict is consistent with the evidence presented at trial, there was no violation of a clear and unequivocal rule of law.

[¶39]   We take this opportunity to clarify our analysis of jury instructions under the plain-error standard.  We have said repeatedly, "the test of adequate jury instructions is whether [the jury instructions] leave no doubt as to the circumstances under which the crime can be found to have been committed." *Blevins*, ¶ 26, 393 P.3d at 1255 (citations and internal quotation marks omitted).  The jury instructions, as a whole, must "correctly state the law and adequately cover the relevant issues." *Id.*  If the instructions are adequate, we need not look to the context of the trial to determine whether the jury was misled or confused in reaching a unanimous verdict.  In other words, we must first determine whether the jury instructions, as a whole, were adequate.  If so, we affirm.  If not, we recognize the error and continue to determine whether the defendant was prejudiced after considering the record as a whole.

[¶40]   Notably, the State does not argue that the *jury instructions*, when viewed as a whole, distinguish Counts I, II, III, IV, and V.  In this case, the jury determined Mr. Walker was guilty of three instances of third-degree sexual abuse of a minor when he was charged with five.  The instructions stated each charge was to be considered separately, yet the jurors were not told that they must unanimously agree which *time* in the sequence each count occurred.  *Ruiz v. Commonwealth*, 471 S.W.3d 675, 679 (Ky. 2015) ("Without an instruction to channel the jury's deliberation, the jury was left to adjudicate guilt on any or all of the vaguely alleged incidents, resulting in a verdict of doubtful unanimity."); *State v. Escobar*, 523 S.W.3d 545, 549 (Mo. Ct. App. 2017) ("where there are repeated instances of the same charged criminal conduct within the same charged timeframe, the possibility that a jury may convict based on different underlying acts presents the danger that a jury, in finding the defendant guilty, has done so without unanimously agreeing on a specific instance of criminal conduct").

[¶41]  The North Dakota Supreme Court's decision in *State v. Martinez* is instructive.  There, "the State charged Martinez with three counts of gross sexual imposition based on three separate and distinct incidents." *State v. Martinez*, 2015 ND 173, ¶ 16, 865 N.W.2d 391, 396–97.  "Martinez requested the court provide the jury with a copy of the complaint,[5] which included factual allegations distinguishing between the three counts, or include information in the jury instructions which would allow the jury to identify which specific offense was alleged for each count.  The court denied his request." *Id.*  Citing numerous cases from other jurisdictions, the North Dakota Supreme Court reasoned:

---

[5] "The complaint included underlying facts and the specific acts allegedly committed for each count.  Section 29-21-01(1), N.D.C.C., requires the clerk or state's attorney to read the complaint to the jury." *Martinez*, ¶ 17, 865 N.W.2d at 397.

> Jury instructions must correctly and adequately inform the jury of the law and must not mislead or confuse the jury. When the defendant is charged with multiple counts of the same offense, a lack of specificity in the jury instructions and the failure to include any distinguishing information about the allegations for each count misstates the law and may cause potential unanimity problems. All verdicts in criminal cases must be unanimous. When the jury instructions and verdict forms do not include information identifying the underlying acts for each count and distinguishing between the counts and the instructions do not inform the jury that it must unanimously agree on the specific act that formed the basis for each count, the jurors may follow the instructions and unanimously agree that the offense was committed but individually choose different underlying acts to determine guilt.

*Id.* ¶ 18, 865 N.W.2d at 397 (citations omitted). *See State v. Marcum*, 166 Wis. 2d 908, 920–22, 480 N.W.2d 545, 551–53 (Ct. App. 1992) (if identical verdict forms are permitted for crimes identically charged and only a general unanimity instruction is given, the door is left open to the possibility of a fragmented or patchwork verdict with different jurors basing the decision to find the defendant guilty of one count on certain acts and other jurors using those same acts to find the defendant not guilty on other counts); *see also People v. Cardamone*, 885 N.E.2d 1159, 1188 (Ill. App. Ct. 2008); *Harp v. Commonwealth*, 266 S.W.3d 813, 819 (Ky. 2008); *R.A.S. v. State*, 718 So. 2d 117, 122–23 (Ala. 1998) (applying "either/or" rule, requiring the state elect an act for each count or the jury be instructed that they must all agree which specific act was committed, to protect the defendant's right to a unanimous verdict); *Jackson v. State*, 342 P.3d 1254, 1257 (Alaska Ct. App. 2014) (applying either/or rule, and holding the failure to properly instruct the jury is a constitutional violation); *State v. Arceo*, 928 P.2d 843, 874–75 (Haw. 1996) (failure to properly instruct the jury violated the defendant's constitutional right to a unanimous verdict); *Baker v. State*, 948 N.E.2d 1169, 1176–79 (Ind. 2011) (applying either/or rule); *State v. Celis-Garcia*, 344 S.W.3d 150, 158 (Mo. 2011) (defendant's constitutional right to unanimous verdict violated, court did not instruct the jury it must unanimously agree on at least one underlying act); *State v. Weaver*, 1998 MT 167, ¶¶ 26, 38, 964 P.2d 713, 718, 721 (failure to instruct the jury that it had to reach a unanimous verdict as to at least one specific underlying act for each count was reversible error), *abrogated by statute on other grounds by State v. Deines*, 2009 MT 179, ¶¶ 14–16, 208 P.3d 857, 861–62.

[¶42] The North Dakota Supreme Court held that because the jury instructions did not factually differentiate the counts and the jury was not told they had to unanimously agree on the underlying act for each count, the jury could follow all of the court's instructions, agree on the defendant's guilt, but disagree on the specific act or acts committed.

Therefore, the instructions did not properly inform the jury of the law. *Martinez*, ¶ 21, 865 N.W.2d at 398.

[¶43] The instructions in Mr. Walker's trial suffer the same infirmity. The jury was presented with five identical charges, committed in the same manner, in the same location, within the same time frame, with the same perpetrator and the same victim, and KR's testimony referred to up to ten separate instances of abuse. Nothing in the instructions differentiated the charges or notified the jury they must be unanimous as to the underlying facts supporting each charge. Here, neither the jury instructions nor the verdict form explained that Count I referred to the "second event" or the second time Mr. Walker entered KR's room, or that it charged Mr. Walker for his actions for the first time he inappropriately touched her. The instructions did not clarify that the charges were stated sequentially. In this case, the jury could have faithfully followed the district court's instructions and agreed that Mr. Walker was guilty of *three* instances of third-degree sexual abuse of a minor, but we cannot say with certainty that there was unanimous agreement as to which of the *five* counts charged were proven beyond a reasonable doubt through the jury instructions alone. The instructions on Counts I, II, III, IV, and V in this case cannot pass constitutional muster.

[¶44] We reject Mr. Walker's contention that Count VI is also suspect because the jury was never told which specific incident included Mr. Walker's attempt to place his face against KR's vagina. Unlike Counts I through V, which were distinguishable only by sequential order, Count VI was a single charge based on specific conduct during a specific period of time. The State did not need to establish when Count VI occurred in relation to the other incidents. The State need prove only that Mr. Walker attempted to perform oral sex on KR within the identified time frame, January 19, 2020, to February 9, 2020. *See Ortiz v. State*, 2014 WY 60, ¶ 88, 326 P.3d 883, 900 (Wyo. 2014) ("where the specific date is not a required element of the crime, then alleging a general time period in lieu of a specific date, is sufficient to give a defendant notice and allow him to adequately prepare a defense . . . and, it is sufficient to establish the transaction rather than the exact date or dates in question" (citations and quotations marks omitted)). Because there is no uncertainty as to the time frame or the conduct underlying Count VI, the verdict is affirmed.

[¶45] We are mindful of the difficulty faced by the prosecution in cases such as this. The unanimity requirement has been considered in a number of cases across the country addressing situations where the charged criminal conduct is repeated instances of the same acts of sexual abuse against minor victims. *See, e.g.*, *Heywood*, 170 P.3d 1227; *Hoeber v. State*, 488 S.W.3d 648, 653 (Mo. 2016) (en banc). Because the victims are children and often do not have a recollection of the specific dates on which the abuse occurred, the State in charging the criminal conduct often attempts to set forth in generic terms the alleged criminal conduct within a certain timeframe. *See Alicea*, 13 P.3d at 699–700. However, as pointed out above:

[W]here there are repeated instances of the same charged criminal conduct within the same charged timeframe, [especially when the conduct occurred in the same location,] the possibility that a jury may convict based on different underlying acts presents [a real] danger that a jury, in finding the defendant guilty, has done so without unanimously agreeing on a specific instance of criminal conduct.

*Escobar*, 523 S.W.3d at 549.

[¶46]  We recognize:

the plight of the litigants and trial courts who, having been charged with ensuring a defendant's guarantee of a unanimous verdict is embodied in the jury instructions, are left with minimal guidance when the . . . scenario of indistinguishable acts of abuse . . . become the nightmarish reality for some innocent child.

*State v. Carlton*, 527 S.W.3d 865, 874–78 (Mo. Ct. App. 2017).  We recognize that an instruction ensuring unanimity may require modification to address the individual facts of each case.  As we have often said,

[j]ury instructions should inform the jurors concerning the applicable law so that they can apply that law to their findings with respect to the material facts, instructions should be written with the particular facts and legal theories of each case in mind and often differ from case to case since any one of several instructional options may be legally correct[.]

*Heywood*, ¶ 26, 170 P.3d at 1234 (quoting *Leyva*, ¶ 8, 106 P.3d at 876 (quoting *Mueller*, ¶ 9, 36 P.3d at 1155)).

[¶47]  The State points to *Brown v. State* for the proposition that it is improper to insert facts into the jury instructions.  In *Brown*, we affirmed the trial court's rejection of the defendant's proposed jury instructions which inserted specific facts to clarify the basis of separate charges.  Brown was tried on one charge of second-degree sexual assault of S.P. (Count I); two charges of taking indecent liberties with C.P. (Counts II and III); three charges of second-degree sexual assault (based upon a position of authority) upon C.P. (Counts IV, V, and VI); and an additional charge of second-degree sexual assault, again based upon a position of authority, upon M.P. (Count VII).  "Brown filed a Motion for a Bill of Particulars detailing the several charges, and a response was filed by the State." *Brown*, 817 P.2d at 432.  The State indicated that Count II was based on an accusation that

23

Brown fondled C.P.'s breasts, and that Count III was based on an accusation that he required C.P. to pose nude for photographs.

[¶48]   After the jury convicted Brown on all counts, he appealed claiming the district court erred in refusing his proposed jury instructions containing the factual basis for each charge and a requested instruction on unanimity.  We rejected his arguments, stating:

> The jury instructions, the testimony of the child victim of the offenses charged in Counts II through VI of the Information, and the Bill of Particulars with respect to those counts demonstrate that there could have been no substantial likelihood of Brown being convicted for some conduct other than the offense that was charged.

*Id.* at 436.  We said:

> These instructions were parallel to the "element of the offense" instructions that the court gave.  The difference was that Brown's proposed instructions included descriptions of the specific acts as they had been identified by the response to the motion for a bill of particulars.  Thus, Brown's proposed instruction on Count II read as follows:
>
> > The necessary elements of the crime of taking immodest, immoral or indecent liberties with a child are:
> >
> > 1.  The crime occurred within the County of Platte on or about the date of July 25, 1989, through August 10, 1989; and
> >
> > 2.  The defendant knowingly took immodest, immoral or indecent liberties with [C.P.], a child under the age of 19 years;
> >
> > 3.  *By touching her breasts with his hands. . . .* (Emphasis added.)
>
> . . . The one crucial difference between Brown's proposed instructions and those given is that Brown's defined the acts that constituted the offenses charged.  If those instructions had been given, they clearly would have circumscribed the fact

24

finding process for the jury. This is not the function of instructions to a jury under our judicial system.

*Id.* at 438–39.

[¶49] Mr. Brown also proposed a specific unanimity instruction which read:

> The defendant is accused of crimes which may be committed in more than one way. The verdict form does not require that you specify the way in which you find that each individual count was committed. The law, however, does require that you agree unanimously on the acts which constitute each offense.

*Id.* at 439.

[¶50] The trial court refused Mr. Brown's proposed instruction, but gave a general unanimity instruction stating, "Your verdict must represent the considered judgments of each juror. In order to return a verdict, it is necessary that each juror agree thereto. . . ." *Id.* After recognizing that the Wyoming Constitution does recognize the right of a criminal defendant to a unanimous verdict by twelve impartial jurors, we said: "We have not previously interpreted this right in a way that requires jurors, when returning a general verdict, to be unanimous as to the manner in which the crime was committed. Neither have we required an instruction like that requested by Brown." *Id.* We noted other courts had required this type of instruction, but determined this was not the proper case to "adopt a requirement for a unanimity instruction" such as this, because even if there were error here, "there was no reasonable likelihood that the jury failed to reach unanimity as to the crimes charged." *Id.* On the only count where two specific but similar acts were described in the testimony, the "testimony of the deputy sheriff cured this defect in specificity." *Id.*

[¶51] We appreciate the State's concern that an attempt to distinguish multiple identical counts with reference to facts in the jury instructions would invade the province of the jury given the language in *Brown*, but we fail to see how that would occur. Even if the jury instructions identified the facts which the State claims constitute the offense, the jury still has the exclusive province of determining whether the evidence proves those facts beyond a reasonable doubt or not. More importantly, this concern does not negate the need for a jury to understand which acts the State claims violate each charged count—the jury must agree on the specific facts supporting each conviction. We trust our courts and attorneys to capably avoid this problem when constructing instructions sufficient to inform the jury of the law without treading on the role of the jury as the ultimate factfinder.

[¶52] We have addressed the need for specificity in criminal charging documents and jury instructions. In *Roberts*, ¶ 29, 513 P.3d at 857 ("[W]e caution the State and district courts

25

to be mindful of the need for specificity in cases involving multiple counts of the same crime." (quoting *Morones*, ¶ 18, 466 P.3d at 306)). Courts across the country have identified different approaches to ensure a unanimous verdict in cases where a minor is unable to remember specific facts distinguishing multiple instances of ongoing sexual abuse. Several jurisdictions use charging documents as a way to distinguish between the charges for the jury. For example, in *State v. Lente*, the New Mexico Supreme Court wrote:

> First, charging documents in resident child molester cases have unique significance. [*People v. Jones*, 51 Cal. 3d 294, 316, 792 P.2d 643, 655–56 (1990), *as modified* (Aug. 15, 1990).] They must channel the jury's focus and require it to determine if specific instances of illegal conduct were established. A charging document achieves this end by specifying the exact sex-abuse crimes that allegedly occurred and identifying the dates or date ranges when those crimes purportedly happened. Such charges do indeed ask the jury to decide if specific, illegal sex acts took place. This point is particularly evident where the evidence elicited indicates that repeated molestations exceeding the number of specific acts charged were perpetrated, a likely occurrence in resident child molester cases. *People v. Letcher*, 386 Ill. App. 3d 327, 326 Ill. Dec. 98, 899 N.E.2d 315, 323 (2008).

*State v. Lente*, 2019-NMSC-020, ¶¶ 71–72, 453 P.3d 416, 431; *see also Martinez*, 865 N.W.2d 391. This is similar to the majority of jurisdictions which require the prosecution to elect a distinguishing factor such as time, location, or sequence for each charge. In the case at bar, the Bill of Particulars could have been read to the jury, or the jury could have been *instructed* that Count I refers to the first instance of inappropriate touching, and Count II, the second, and so forth. Such designation merely identifies the charge; it does not add or subtract elements of the charge required for conviction. *See supra* ¶ 41 and cases cited therein.

[¶53] Other courts have adopted the use of a specific unanimity instruction, such as the instruction recognized in *Brown*, *supra*. While "[a] general unanimity instruction informs the jury that the verdict must be unanimous, . . . a specific unanimity instruction indicates to the jury that they must be unanimous as to which specific act constitutes the offense charged." 75A Am. Jur. 2d *Trial* § 1149 (2018); 23A C.J.S. *Criminal Procedure and Rights of Accused* § 1878 (2016); *Carlton*, 527 S.W.3d at 874–78 ("to comply with the constitutional mandate that the jury reach a unanimous verdict, the verdict director not only must describe the separate criminal acts with specificity, but the court also must instruct the jury to agree unanimously on at least one of the specific criminal acts described in the verdict director"); *State v. Cottrell*, 445 P.3d 1132, 1138 (Kan. 2019) ("To ensure jury unanimity in multiple acts cases, courts require that either the State elect the particular

criminal act upon which it will rely for conviction or that the district court instruct the jury that all jurors must agree that the same underlying criminal act has been proved beyond a reasonable doubt." (quoting *State v. Bailey*, 255 P.3d 19, 27 (Kan. 2011))).

[¶54] As we have often stated, "The district courts are afforded substantial latitude to tailor jury instructions to the facts of the case." *Dugan v. State*, 2019 WY 112, ¶ 34, 451 P.3d 731, 742 (Wyo. 2019) (quoting *Birch v. State*, 2018 WY 73, ¶ 12, 421 P.3d 528, 533 (Wyo. 2018)); *Wilson v. State*, 14 P.3d 912, 915 (Wyo. 2000); *Streitmatter v. State*, 981 P.2d 921, 925 (Wyo. 1999); *Giles v. State*, 2004 WY 101, ¶ 42, 96 P.3d 1027, 1042 (Wyo. 2004) ("Jury instructions are written with the particular facts and theories of each case in mind." (quoting *Pierson v. State*, 956 P.2d 1119, 1126 (Wyo. 1998), *holding modified by Rabuck v. State*, 2006 WY 25, 129 P.3d 861 (Wyo. 2006))). Our discussion does not impose requirements but is meant to illustrate the different ways courts manage the unanimity problem. That said, we conclude the failure of the instructions in this case to provide the specific direction necessary for a unanimous decision on each charge violated the unequivocal requirement of jury unanimity.

## B. Material Prejudice

[¶55] The final prong of the plain error test is the determination of whether the appellant was prejudiced by the error. *Neidlinger v. State*, 2021 WY 39, ¶ 42, 482 P.3d 337, 349 (Wyo. 2021).

> A defendant is not prejudiced unless he can establish that the given instructions or verdict form confused or misled the jury. *Tingey v. State*, 2017 WY 5, ¶ 40, 387 P.3d 1170, 1181 (Wyo. 2017) ("Because the purpose of jury instructions is to provide guidance on the applicable law, prejudice will result when the instructions confuse or mislead the jury."); *Giles v. State*, 2004 WY 101, ¶ 14, 96 P.3d 1027, 1031 (Wyo. 2004) ("Prejudice will be determined to exist only where an appellant demonstrates that the instruction given confused or misled the jury with respect to the proper principles of law.").

*Neidlinger*, ¶ 42, 482 P.3d at 349; *see also Bernal-Molina v. State*, 2021 WY 90, ¶ 19, 492 P.3d 904, 910 (Wyo. 2021); W.R.A.P. 9.05 ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court."). "If the charge as a whole is ambiguous, the question is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Middleton v. McNeil*, 541 U.S. 433, 437, 124 S.Ct. 1830, 1832, 158 L.Ed.2d 701 (2004) (citations and quotation marks omitted).

27

[¶56]   Mr. Walker asserts material prejudice is demonstrated not only because the jury was potentially confused about which count corresponded to which instance of alleged abuse, but also because the jury's verdict reached an absurd result in finding Mr. Walker guilty of three counts and not guilty on two counts based on the same evidence.  The State responds that, while the jury instructions did not specifically identify each count as a sequential act, the instructions were sufficient if they are viewed in the context of the entire trial. Specifically, KR's testimony and the closing argument sufficiently established the sequential nature of the charges so that the jury understood that Count I was the first time of inappropriate touching, Count II the second inappropriate touching, and Count III the third.

[¶57]   As discussed above, we conclude that the instructions in this case misled the jury by failing to distinguish the counts or instruct that they must be reach unanimity on the factual basis for each count.  Contrary to the State's argument that the record and closing argument can cure or nullify the error, we again emphasize our review of the complete record pertains only to the existence of prejudice to the defendant caused by the error.  The error remains.  To the extent our past decisions have suggested otherwise, we clarify that the existence of plain error and whether the error is prejudicial requiring reversal of the conviction are two separate matters.  *See Escobar*, 523 S.W.3d at 551–52 (Arguments of counsel could not cure the error in the jury instructions "as we must presume that the jury followed the jury instructions as written not the State's closing argument."  However, the defendant failed to prove he was prejudiced by the error.).

[¶58]   "In determining whether [the defendant] was prejudiced, we review the entire record."  *Hathaway v. State*, 2017 WY 92, ¶ 33, 399 P.3d 625, 634 (Wyo. 2017); *Talley v. State*, 2007 WY 37, ¶ 14, 153 P.3d 256, 261 (Wyo. 2007); *Sweet v. State*, 2010 WY 87, ¶ 31, 234 P.3d 1193, 1205 (Wyo. 2010); *Pendleton v. State*, 2008 WY 36, ¶ 11, 180 P.3d 212, 216 (Wyo. 2008).   The State asserts KR's testimony and the clarification of the individual charges in the State's closing argument precludes a finding that Mr. Walker was prejudiced by the instructional error.

[¶59]   KR testified that the first time Mr. Walker entered her room "he sat in the corner of my bed and started talking, . . . and then he started . . . petting me on the stomach, around my chest.  He didn't actually touch; he just rubbed around."  The second time he came into her room, KR was "messing around" with her phone while laying on her bed.  She testified Mr. Walker touched her "in the privates," her vagina with his hands.

[¶60]   When asked about the third time he came into her room, she said, "it [was] basically like the second."  When the prosecutor asked, "So when you say you think he touched your vagina," KR responded "No, I mean, like, . . . the third day he may or – like, he – I don't know if it was the, like, third day or the fourth day he'd gone far, but, like, that's what I'm saying . . . but I know for a fact he did."

28

[¶61]  At this point the questioning diverted to the events describing Count VI.  After KR testified to Mr. Walker's attempt to lick her vagina, the prosecutor attempted to return to the other charges by asking, "[S]o you've said that the third time was . . . like the . . . second time . . . where he came in and touched your vagina with his hands over your clothes[?]" The prosecutor's references to "the third time" and the "second time" obviously confused KR because she responded, "Actually, I think I was in my underwear at the time. . . . I think, like, the first day I had pants on, so he couldn't really do anything."  The prosecutor asked, "The first time when he rubbed your stomach and . . . didn't actually touch any of your intimate parts, you think you were wearing pants?"  KR answered, "Yes."  "And after that, you think  that you were wearing panties?"  KR answered, "Yes, sir."

[¶62]  The prosecution then asked about the fourth and fifth time Mr. Walker went into the room.  KR stated, "I'm pretty sure he did the same thing as, like, the second one and third one. . . . [T]he fourth day . . . I'm pretty sure on the fifth day he started to take his clothes off."  According to the State's chronology, the "fifth day" would relate to Count IV.  But the testimony becomes even more confusing because the prosecutor never questioned KR about the "sixth day," which would have been Count V, in his direct examination of KR. The only mention of a sixth day was during cross-examination, as follows:

> Q.     Now, you told law enforcement that this could have happened up to ten times; correct?
> A.     Yeah.
> Q.     Can you distinguish what happened on the sixth time from the other occasions?
> A.     No.  I think the same thing happened.
> Q.     Seventh time?  Eighth?
> A.     No.
> Q.     Ninth?
> A.     No.
> Q.     Tenth?
> A.     No.

[¶63]  The cross-examination achieved a bit more clarity as the questions followed the sequence of the charged inappropriate touching.  However, KR could not be sure how many times Mr. Walker inappropriately touched her, only that it happened "more than three" times.

[¶64]  The State further argues that the closing argument clearly established the factual basis for each count.  The prosecutor argued in relevant part:

> What evidence do you have that [Mr. Walker] engaged
> in sexual contact with [KR]?  And what you have is her direct,
> eyewitness testimony as a person who was there, as the person

who experienced it. Mr. Walker entered her room and, on one occasion, touched her in a way, it wasn't criminal. She called that the first time that he entered her room. He said sorry, told her not to tell. And you know what? She didn't tell. *It's the second time he enters her room, the first time he touches her inappropriately, that's what Count I is.* Testimony of [KR] was that he touched her vagina area, above her clothes. On that occasion, he didn't take off his clothes, he didn't take off her clothes, but he rubbed her vagina. That is sexual contact. . . .

Count II, same elements. [KR] says he comes in a second time. The second time he touches her. . . . Count III, the same. KR begins talking, Count IV, about other stuff that the Defendant starts doing, not the first time, not the second time. It's the third time. He gets more brazen. This time he takes off some of his own clothing. . . . Count V, comes in, sexual contact with her vagina.

(Emphasis added.)

[¶65]   We, in line with other jurisdictions, have considered clarifying statements in closing argument when affirming a conviction based on ambiguous instructions. *Gentilini*, ¶¶ 16–26, 231 P.3d at 1285–88; *State v. Henry*, 568 S.W.3d 464, 477 (Mo. Ct. App. 2019) ("the State in closing argument specified that the sodomy charge in count III was for the conduct that occurred on Carr St. in the laundry room when Henry would have S.B. move the trash can before sodomizing her"); *State v. Babcock*, 2020 SD 71, ¶¶ 47–49, 952 N.W.2d 750, 764 ("The jury can also be properly informed of which offense corresponds to each count by the use of proper jury instructions, or, if clearly and succinctly stated, it can be expressed during closing remarks."); *Middleton*, 541 U.S. at 438, 124 S.Ct. at 1833 ("Nothing in *Boyde* [*v. California*, 494 U.S. 370, 384, 110 S.Ct. 1190, 1200, 108 L.Ed.2d 316 (1990)] precludes a state court from assuming that counsel's arguments clarified an ambiguous jury charge.").

[¶66]   Here, KR clearly testified to the facts as to the second time Mr. Walker entered her room. In the State's closing argument, the prosecutor succinctly stated that Count I was based on the second time Mr. Walker entered KR's bedroom. Given KR's testimony and the direct information in the closing statement, we find no reasonable probability that the jury did not reach a unanimous conclusion for the factual basis of Count I.

[¶67]   The same cannot be said for the remaining charges. Other than identifying the first inappropriate touching, the remainder of KR's testimony was unclear as to facts supporting Counts II and III, and the closing argument does nothing to clarify these counts for the jury. In fact, the argument claims there was a fifth event, while a sixth entry into KR's bedroom

30

was never established in the testimony. There is a reasonable probability that the jury did not reach unanimity on Counts II and III.

[¶68] Finally, the State argues Mr. Walker cannot establish prejudice because there is no evidence of juror confusion as demonstrated by the jury questions in *Heywood*, *Morones*, and *Gentilini*. The problem with limiting our focus to evidence of jury confusion is that it distracts from the constitutional problem—the possibility that the jury did not reach unanimity on each charge. It is entirely possible that a jury may not feel confused, especially if it has been *misled* by the instructions it was given. Here, the jury was never instructed that they must be unanimous as to the factual basis for each count. The jury's unanimous conclusion that KR was abused three times is not sufficient when the State presented evidence of more than three events.

[¶69] We cannot pretend to know what occurred in the jury room. However, we presume the jury followed the court's instructions. *Haynes v. State*, 2008 WY 75, ¶ 22, 186 P.3d 1204, 1209 (Wyo. 2008); *Collins v. State*, 2015 WY 92, ¶ 22, 354 P.3d 55, 60 (Wyo. 2015). The instructions allowed individual jurors to rely on different acts of abuse from the larger pool of alleged criminal acts presented by the State as the basis for returning convictions on Counts II and III.

## *CONCLUSION*

[¶70] The district court's failure to properly instruct the jury violated a clear and unequivocal rule of law which adversely affected Mr. Walker's substantial rights. We therefore affirm Mr. Walker's convictions on Counts I and VI, reverse his convictions on Counts II and III, and remand for a new trial on these counts.