# IN THE SUPREME COURT, STATE OF WYOMING

## 2023 WY 26

**OCTOBER TERM, A.D. 2022**

**March 29, 2023**

KELLY JAMES PERSON,

Appellant
(Defendant),

v.                                                                                          S-22-0108

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Laramie County*
*The Honorable Peter H. Froelicher, Judge*

*Representing Appellant:*

*Office of the State Public Defender: Diane Lozano, Wyoming State Public Defender; Kirk A. Morgan, Chief Appellate Counsel; Robin S. Cooper, Senior Assistant Appellate Counsel. Argument by Ms. Cooper.*

*Representing Appellee:*

*Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Donovan Burton, Assistant Attorney General. Argument by Mr. Burton.*

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.*

*FOX, C.J., delivers the opinion of the Court; BOOMGAARDEN, J., files an opinion concurring in part and dissenting in part, in which FENN, J., joins.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FOX, Chief Justice.**

[¶1]    A jury convicted Kelly James Person of stalking his ex-wife. On appeal, he argues he was denied his right to a speedy trial and the district court committed prejudicial error by providing a general intent jury instruction when stalking is a specific intent crime. We conclude Mr. Person was not denied his right to a speedy trial and although the district court erred by instructing the jury as it did, the error was not prejudicial. We affirm.

## *ISSUES*

[¶2]    We rephrase the issues:

> 1.    Was Mr. Person denied his right to a speedy trial under Wyoming Rule of Criminal Procedure (W.R.Cr.P.) 48 or the Sixth Amendment to the United States Constitution?[1]
>
> 2.    Did the district court commit reversible error by providing the jury a general intent instruction when stalking is a specific intent crime?

## *FACTS*

Background & 2019 Proceedings

[¶3]    Mr. Person and AP divorced in June 2019. AP was awarded sole custody of their two minor children. Mr. Person persistently contacted AP over the next several months, in violation of his bond conditions in two misdemeanor cases.

[¶4]    On September 24, 2019, the State charged Mr. Person with one count of felony stalking, alleging that, between September 17 and 23, 2019, he "did unlawfully with intent to harass [AP], engage in a course of conduct reasonably likely to harass [AP]," in violation of Wyo. Stat. Ann. § 6-2-506(b)(i)-(iv) (LexisNexis 2021). The State further alleged the offense was a felony because Mr. Person "did so in violation of [a] condition of probation, parole or bail" pursuant to § 6-2-506(e)(iii) (LexisNexis 2021). The State later amended the charge to allege Mr. Person stalked AP between August 8 and September 23, 2019.

---

[1] Mr. Person references his right to a speedy trial under the Wyoming Constitution but does not separately analyze its application to his case. We therefore do not address his speedy trial claim under the Wyoming Constitution. *See Crebs v. State*, 2020 WY 136, ¶ 13 n.4, 474 P.3d 1136, 1142 n.4 (Wyo. 2020).

[¶5]    The circuit court held Mr. Person's preliminary hearing on October 4 and bound the charge over to the district court where he was arraigned on October 10.[2] He pled not guilty, and his trial was scheduled for February 10, 2020.

2020 Proceedings

[¶6]    On January 22, 2020, Mr. Person's first attorney (retained counsel) moved to have him examined by the Wyoming State Hospital to determine whether he could conform his conduct to the law at the time of the alleged incidents and effectively assist in his defense. Mr. Person objected to the evaluation. He did not want to enter a not guilty by reason of mental illness plea and asked the court to appoint a public defender to represent him. On January 31, after receiving Mr. Person's affidavit of indigency, the court appointed the Office of the State Public Defender to represent him. It then continued trial to March 16.

[¶7]    On March 3, the court, on the State's motion, ordered the Wyoming State Hospital to examine Mr. Person to assess his competency to proceed. It granted the Hospital one extension to complete the report due to pandemic-related travel restrictions. The Hospital filed a report on May 27 opining that Mr. Person was competent to proceed. The court held an evaluation status hearing on June 18 and placed the case on the trial stack for July 27.

[¶8]    Governor Mark Gordon declared a state of emergency in Wyoming on March 13 due to the public health risk posed by the coronavirus. On March 18, this Court ordered Wyoming district courts to take certain precautions, including suspending most in-person proceedings until April 10, and later extended the suspension to May 31 and again to August 3. By order dated July 24, this Court requested each judicial district to develop and submit a jury trial operating plan for approval before conducting jury trials. The district court continued Mr. Person's trial to August, explaining to the parties that the First Judicial District was in the process of developing its operating plan. Defense counsel did not object to the continuance when the court announced it during a scheduling conference. The court's continuance order notified Mr. Person of his right to file a written objection within five days, and he again did not object.

[¶9]    In August, the court again continued trial to September due to the pandemic. The First Judicial District had filed an approved operating plan but did not have enough employees to execute the plan. The continuance order provided Mr. Person notice of his right to file a written objection within five days. He again did not file a written objection.

---

[2] Mr. Person's bond was initially set at $250,000 cash and later reduced to $25,000 cash. He was unable to post bond.

[¶10] In September, the court continued trial to October because the Sheriff's Department was waiting for a temperature scanner to arrive and needed to train the bailiffs how to conduct health screenings in accordance with the jury trial operating plan. Defense counsel objected to this continuance at a scheduling conference. The court instructed Mr. Person to file a written objection addressing substantial prejudice, and restated Mr. Person's opportunity to object within five days in its continuance order. No written objection was filed.

[¶11] In October, the court continued trial to December because the First Judicial District's approved jury trial operating plan provided that each of the four district court judges could conduct a jury trial for only five days per month. Both sides agreed they needed more than five days for Mr. Person's trial. The court's continuance order notified Mr. Person of his right to file a written objection within five days. He did not file a written objection.

[¶12] In December, the court continued trial to February 2021, based on this Court's November 13 order stating no jury trials should be conducted until further notice due to a dramatic increase in coronavirus cases in Wyoming. Moreover, the court still could not accommodate a trial longer than five days. The court's continuance order provided Mr. Person notice of his right to file a written objection within five days. He did not file a written objection.

2021 Proceedings

[¶13] In February 2021, the court continued trial to March based on this Court's January 6 order, which stated no jury trials should be conducted even if the court had an approved jury trial operating plan unless the courthouse conditions and community health allowed for jury trials to be conducted safely. The court found it could not safely conduct a jury trial in February, and the First Judicial District needed additional time to amend its operating plan and train participants accordingly. The court's continuance order notified Mr. Person of his right to file a written objection within five days. He did not file a written objection.

[¶14] The court then continued trial to April because it still could not accommodate trials requiring more than five days. The court's continuance order notified Mr. Person of his right to file a written objection within five days. He did not file a written objection.

[¶15] In April, the court continued trial to May. At a scheduling conference, the court explained it still could not accommodate trials lasting longer than five days. For the first time, the State asserted the case could be tried in five days. Defense counsel disagreed. The court deferred to defense counsel and continued the trial but asked the parties to carefully examine the issue. The court's continuance order notified Mr. Person of his right to file a written objection within five days. He did not file a written objection.

3

[¶16] Mr. Person filed his first written objection to the continuance of his trial in May. Before hearing the objection, the court continued trial to June. At a scheduling conference, the court explained it could not accommodate trials lasting more than five days but hoped to be able to do so beginning July 1. Defense counsel remained adamant Mr. Person's trial would take more than five days. The State continued to believe the case could be tried in five days but deferred to defense counsel. The court continued trial and set a hearing on Mr. Person's objection.

[¶17] At the hearing, defense counsel stated Mr. Person would be ready for trial by the end of June and needed more than five days for trial. The court left the trial setting for June, noting it could not accommodate trials requiring more than five days under its current jury trial operating plan. The court also noted it had an obligation to keep all jury participants safe from the coronavirus, and Mr. Person failed to show the delay would substantially prejudice him.

[¶18] Later in May, the court continued trial to July 26. The continuance order explained that the First Judicial District had adopted and filed a second amended jury trial operating plan that, effective July 1, would allow district court judges in the First Judicial District to conduct concurrent jury trials, thus allowing each judge to begin docketing trials that could last longer than five days. The court, however, had five pending criminal cases, including Mr. Person's, that had been significantly delayed due to the prior jury trial limitations. Six days were set aside for his trial, which was stacked first. The order notified Mr. Person he had ten days to file a written objection addressing how the delay may prejudice his defense. He did not file a written objection.

[¶19] In early June, Mr. Person retained a private attorney (trial counsel). On July 15, trial counsel moved to dismiss the case with prejudice on speedy trial grounds. The court heard argument on the motion and denied it.

[¶20] Mr. Person's trial commenced on July 26, 2021, and lasted four days. The State's main witness, AP, testified about a series of incidents that occurred after her divorce from Mr. Person, when his bond conditions required he have no contact with her. She testified:

- On August 10, someone driving Mr. Person's cousin's vehicle pulled up next to AP's car parked in the Texas Roadhouse parking lot while she was working there. The individual exited the vehicle, pried open the gas tank to AP's vehicle, and poured a white substance inside, disabling the vehicle. AP suspected Mr. Person based on surveillance video footage.

4

- On August 29 and 31, someone entered the home she and Mr. Person previously lived in together and destroyed the personal belongings she had stored there. AP suspected Mr. Person because his brother lived in the house, only her belongings were destroyed, and certain pieces of jewelry Mr. Person had given AP while they were together were missing.

- On September 4, Mr. Person left a note on her vehicle stating the vehicle was paid through December, he would like a contact number for his children, and "if it continues nothing good will come."

- On September 5, Mr. Person sent AP an email stating "You are an exaggerating b*tch[,] you are are [sic] trying to convince my children to fear[,] you are a piece of sh*t money hungry b*tch . . . take this email to the police to you lier [sic] . . . [for] this stalking criminal case . . . you are a piece of sh*t live in fear then." (altered) He also showed up at their daughter's elementary school and yelled obscenities at AP.

- On September 8, Mr. Person's acquaintance passed along a message from Mr. Person that led AP to call the police.

- On September 9, AP received an email from Mr. Person calling her obscene names and telling her that now their children were not going to have a mom or dad. That night, Mr. Person entered the restaurant where she worked and was looking around for her. AP felt threatened and called 911. He had a noticeable bulge on his hip, covered by his shirt. Mr. Person sat at the bar for a few minutes, drinking a beer and scanning the restaurant. He left shortly thereafter, before police arrived.

- On September 10, AP was driving her son to soccer practice when a vehicle she did not recognize began following her and nearly ran her off the road. It was Mr. Person driving a rental car and wearing a disguise. He tried to enter the vehicle through the driver's side and passenger's side door, as the children screamed, but the

5

doors were locked. He left immediately when AP's son called 911.

- On September 11, AP went to Enterprise Rent-A-Car to rent a vehicle so Mr. Person would not know what she was driving. While there, she noticed Mr. Person's cousin approaching and felt threatened, so the employees locked the building and she called 911. Later that day, Mr. Person texted the children's phone stating he saw them at Enterprise.

- On September 23, AP received a phone call from a restricted number. She answered and recognized Mr. Person's voice. He called her a "f*cking b*tch" and hung up. (altered) She then received several text messages accusing her of being in a romantic relationship with someone else and threatening to torture the man and make him "squeal like a pig" while she watched.

[¶21] Mr. Person testified in his own defense. He countered AP's recollection of certain events and suggested she was exaggerating. For example, Mr. Person suggested the vehicle incident involved a misunderstanding. He planned to go to the soccer field to watch his son's soccer practice because he had not seen his children for a long time. He thought his children would think it was funny if he wore a hat and wig, and he was driving a rental car because his was in the shop for repairs. When he drove past AP, he turned around to follow her to the soccer field, did not run her off the road, and approached her car after she parked. In addition, Mr. Person denied putting anything in AP's gas tank or destroying her personal belongings, and offered explanations for some of his statements to AP. He further denied having any intent to harass AP.

[¶22] Amanda Wilson, manager of the Texas Roadhouse at the time of the alleged incidents, also testified that Mr. Person called the restaurant and demanded to talk to AP. When she refused, Mr. Person became very upset, screamed profanities at her, and threatened to come to the restaurant and kill Ms. Wilson and AP. Ms. Wilson immediately locked the front doors of the building and called the police.

[¶23] Over trial counsel's objection, the court provided the jury a general intent instruction (Instruction No. 14), along with a correct instruction on the elements of stalking (Instruction No. 15). The jury found Mr. Person guilty of stalking on July 30. He was sentenced to four to six years in prison, with 828 days credit for time served.

*DISCUSSION*

**I.      Mr. Person was not denied his right to a speedy trial under W.R.Cr.P. 48 or the Sixth Amendment to the United States Constitution.**

[¶24]  Mr. Person argues the State violated his right to a speedy trial under Rule 48 and the Sixth Amendment to the United States Constitution. We review his speedy trial claims de novo. *Vlahos v. State*, 2022 WY 129, ¶ 31, 518 P.3d 1057, 1066 (Wyo. 2022).

**A. W.R.Cr.P. 48**

[¶25]  We first address Mr. Person's Rule 48 speedy trial claim. Rule 48(b)(2) requires a criminal charge to be brought to trial within 180 days after arraignment unless trial is continued under one of the rule's exceptions. W.R.Cr.P. 48(b)(2). Rule 48(b)(5) requires dismissal of any criminal case that is not so tried or continued. W.R.Cr.P. 48(b)(5). Compliance with the rule is mandatory. *Vlahos*, 2022 WY 129, ¶ 32, 518 P.3d at 1067 (citing *Castellanos v. State*, 2016 WY 11, ¶ 49, 366 P.3d 1279, 1294-95 (Wyo. 2016)).

[¶26]  Rule 48 excludes "[a]ll proceedings related to the mental illness or deficiency of the defendant" and "[d]elay occasioned by defendant's change of counsel" from the 180-day computation. W.R.Cr.P. 48(b)(3)(A), (D). The court may also continue trial beyond 180 days on its own motion if "[r]equired in the due administration of justice and the defendant will not be substantially prejudiced[.]" W.R.Cr.P. 48(b)(4)(B)(iii). If the court proposes a continuance, the defendant must be notified and, if the defendant objects, he "must show in writing how the delay may prejudice the defense." W.R.Cr.P. 48(b)(4)(C).

[¶27]  Mr. Person was arraigned on October 10, 2019, and originally scheduled for trial on February 10, 2020, 123 days after arraignment. His trial was delayed numerous times and began on July 26, 2021, 655 days after arraignment. Our Rule 48 analysis requires we determine what amount of that delay, if any, counts toward the 180-day period within which Mr. Person was required to be brought to trial following arraignment. We conclude only the first 123 days count toward the 180-day period.

February 10 to March 3, 2020

[¶28]  The delay from February 10 to March 3, 2020, is excluded from the computation because it was attributable to Mr. Person's change of counsel. W.R.Cr.P. 48(b)(3)(D).

March 3 to June 18, 2020

[¶29]  The delay from March 3 to June 18, 2020, is excluded from the computation because it was attributable to Mr. Person's competency evaluation. W.R.Cr.P. 48(b)(3)(A).

[¶30] Mr. Person suggests the period attributable to his competency evaluation ended when the district court received the Hospital's report on May 27. It did not. We have made clear that the period of delay attributable to competency ends not when the Wyoming State Hospital opines that the defendant is competent to proceed but when the district court makes such determination. *See, e.g.*, *Castellanos*, 2016 WY 11, ¶¶ 55-56, 366 P.3d at 1296; *Vlahos*, 2022 WY 129, ¶ 49, 518 P.3d at 1071. That occurred on June 18.

June 18 to July 27, 2020

[¶31] At the June 18 evaluation status hearing, the court placed Mr. Person's case on the trial stack for July 27, 2020. "As a practical matter, a trial cannot be set to begin the moment a suspension of proceedings is lifted." *Vlahos*, 2022 WY 129, ¶ 43, 518 P.3d at 1069 (quoting *Castellanos*, 2016 WY 11, ¶ 65, 366 P.3d at 1298). "Rule 48 'anticipates such a situation' and 'allows for a continuance of the 180-day limit if required in the due administration of justice and there is no resulting prejudice to the defendant.'" *Id.* (quoting *Castellanos*, 2016 WY 11, ¶ 65, 366 P.3d at 1298). However, trial should be set as soon as possible after competency is established. *Id.* at ¶ 44, 518 P.3d at 1070.

[¶32] The approximate five-week delay from the evaluation status hearing on June 18 to the July 27, 2020, trial setting was reasonable, encompassed the period in which this Court suspended most in-person proceedings, and was necessitated in the due administration of justice pursuant to W.R.Cr.P. 48(b)(4)(B)(iii). *See Vlahos*, 2022 WY 129, ¶ 45, 518 P.3d at 1070. (determining setting trial five months after the competency evaluation status hearing was reasonable in light of the COVID-19 pandemic and the delay did not count against the 180-day period). Moreover, Mr. Person did not object to the setting.

July 27, 2020, to July 26, 2021

[¶33] The court continued trial ten times between July 27, 2020, and July 26, 2021, due to COVID-19. The court regularly held scheduling conferences to discuss the situation with the parties. Each time the court continued Mr. Person's trial it issued a written continuance order documenting the reasons for the continuance, finding the continuance was required in the due administration of justice pursuant to W.R.Cr.P. 48(b)(4)(B)(iii), and providing Mr. Person notice of his right to file a written objection showing how the delay would prejudice his defense.

[¶34] Mr. Person acknowledges the district court "follow[ed] the mandates of Rule 48(b)(4) continuances by giving notice to Mr. Person of the extraordinary circumstances of holding a trial in light of COVID-19 closures and restrictions as to use of a courtroom among four different judges." He notes he "object[ed] in writing and argue[d] how the

delay may prejudice his defense." It is true Mr. Person filed a written objection in May 2021, but the court held a hearing to address his objection and concluded he failed to show the delay would substantially prejudice him. Mr. Person offers no cogent argument to rebut the court's finding or to show why the continuances for the COVID-19 pandemic should not be excluded from the Rule 48 computation. *See Pier v. State*, 2019 WY 3, ¶ 26, 432 P.3d 890, 898 (Wyo. 2019) (citing *Blevins v. State*, 2017 WY 43, ¶ 22, 393 P.3d 1249, 1254-55 (Wyo. 2017) ("We do not address arguments not supported by cogent argument or citation to pertinent authority.")). We conclude the continuance periods should be excluded as they were required in the due administration of justice and the court complied with Rule 48 requirements with each continuance.

## B.  Constitutional Right to Speedy Trial

[¶35]  We turn next to Mr. Person's Sixth Amendment speedy trial claim. The Sixth Amendment to the United States Constitution guarantees criminal defendants a speedy trial. U.S. Const. amend. VI. A constitutional speedy trial analysis requires we consider the four factors articulated in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972): "(1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) prejudice to the defendant." *Vlahos*, 2022 WY 129, ¶ 51, 518 P.3d at 1071 (quoting *Cotney v. State*, 2022 WY 17, ¶ 19, 503 P.3d 58, 66 (Wyo. 2022)). No *Barker* factor is dispositive, and they must be considered "together and balanced in relation to all relevant circumstances." *Id.* (quoting *Fairbourn v. State*, 2020 WY 73, ¶ 42, 465 P.3d 413, 425 (Wyo. 2020)).

### 1.      Length of the Delay

[¶36]  The first *Barker* factor requires we examine the length of the delay. "The constitutional 'speedy trial clock begins to run at the time of arrest, information, or indictment, whichever occurs *first*.'" *Id.* at ¶ 52, 518 P.3d at 1071 (quoting *Cotney*, 2022 WY 17, ¶ 20, 503 P.3d at 66). The clock ends on conviction, on acquittal, or when the defendant is no longer under indictment. *Id.* (citing *Cotney*, 2022 WY 17, ¶ 20, 503 P.3d at 66). "No precise length of delay constitutes an automatic violation of a constitutional right to a speedy trial, but a delay of over 365 days presumptively triggers review of the other *Barker* factors." *Id.* (citing *Cotney*, 2022 WY 17, ¶ 20, 503 P.3d at 66).

[¶37]  Mr. Person was charged with stalking on September 24, 2019, and convicted on July 30, 2021.[3] A total of 675 days elapsed between those dates. The 675-day delay

---

[3] Mr. Person cites no authority to support his assertion that his constitutional speedy trial clock should begin on September 12, 2019, when he was arrested for aggravated assault based on the September 10 vehicle incident, and therefore his argument will not be addressed. *See Pier*, 2019 WY 3, ¶ 26, 432 P.3d at 898.

triggers review of the other *Barker* factors and weighs in Mr. Person's favor. *See Tate v. State*, 2016 WY 102, ¶ 31, 382 P.3d 762, 769 (Wyo. 2016) ("[T]he longer the delay, the more likely it is that the first factor will weigh in the defendant's favor." (citation omitted)); *Vlahos*, 2022 WY 129, ¶ 64, 518 P.3d at 1073 (weighing the 622-day delay in appellant's favor); *Griggs v. State*, 2016 WY 16, ¶¶ 61, 74, 367 P.3d 1108, 1129, 1131 (Wyo. 2016) (weighing the 411-day delay in appellant's favor).

### 2.      Reason for the Delay

[¶38]  The second *Barker* factor requires we examine who or what caused the delay. *Vlahos*, 2022 WY 129, ¶ 53, 518 P.3d at 1071-72 (citing *Cotney*, 2022 WY 17, ¶ 21, 503 P.3d at 66). Any delays caused by the State are weighed against those caused by Mr. Person, bearing in mind the State had the burden to bring Mr. Person to trial in a timely manner and must show the delays were reasonable and necessary. *Id.* at ¶ 53, 518 P.3d at 1072 (citing *Cotney*, 2022 WY 17, ¶ 21, 503 P.3d at 66).

[¶39]  Mr. Person is responsible for the delay from February 10 to March 3, 2020, because it was caused by his change of counsel. *Griggs*, 2016 WY 16, ¶ 63, 367 P.3d at 1129 ("A defendant is responsible for delays associated with his changes of counsel[.]" (citation omitted)).

[¶40]  The delay from March 3 to June 18, 2020, is neutral because it was caused by the competency evaluation and determination. *Vlahos*, 2022 WY 129, ¶ 55, 518 P.3d at 1072 ("Delays due to competency evaluations are considered neutral." (citing *Castellanos*, 2016 WY 11, ¶ 81, 366 P.3d at 1301-02)).

[¶41]  The delay from June 18 to July 27, 2020, is neutral because it was caused by the court's need to re-docket the case after the competency evaluation and determination. *Id.* at ¶ 56, 518 P.3d at 1072 ("Delays due to crowded dockets and court schedules are neutral and are not weighed heavily against the State." (citing *Cotney*, 2022 WY 17, ¶ 21, 503 P.3d at 66)).

[¶42]  The delay from July 27, 2020, to July 26, 2021, is neutral because it was caused by the pandemic. *Id.* at ¶ 54, 518 P.3d at 1072 ("Delays due to [the] COVID-19 pandemic are neutral because the pandemic 'was an extraordinary circumstance not attributable to either the State' or Mr. Vlahos." (quoting *Cotney*, 2022 WY 17, ¶ 24, 503 P.3d at 67)).

[¶43]  The vast majority of the delay is neutral. The second factor weighs only slightly against Mr. Person, as a small portion of the delay is attributable to his change of counsel, and no portion of the delay is attributable to the State.

### 3. Defendant's Assertion of his Right to Speedy Trial

[¶44] The third *Barker* factor requires we examine to what extent, if any, Mr. Person asserted his speedy trial right. *Id.* at ¶ 59, 518 P.3d at 1072. Though Mr. Person did not have to assert his speedy trial right, "the vigor with which [he did so] is an important consideration in determining the reasonableness of any delay." *Id.* (quoting *Cotney*, 2022 WY 17, ¶ 26, 503 P.3d at 67). Consistent assertion of his right would weigh heavily in his favor. *Id.* (citing *Cotney*, 2022 WY 17, ¶ 26, 503 P.3d at 67). Less than vigorous assertion of his right is given little weight. *Id.* (citing *Cotney*, 2022 WY 17, ¶ 26, 503 P.3d at 67).

[¶45] Mr. Person filed a speedy trial demand in circuit court but, for an unknown reason, that demand never made its way into the district court record. On October 27, 2020, Mr. Person filed a motion for bond reduction that touched on speedy trial concerns but contained no speedy trial demand. Defense counsel verbally objected to a continuance at the September 2020 scheduling conference but did not file a written objection addressing prejudice when instructed to do so to preserve the objection. Nor did Mr. Person object when the court repeatedly continued trial between September 2020 and May 2021 due to the pandemic.

[¶46] Mr. Person filed his first written objection to a continuance in May 2021, expressly stating he did not previously object "because he [understood] the situation with the pandemic and the concern [for] public safety." But, even then, he was not prepared to go to trial in May and stated he would be ready to go to trial in June. After obtaining different counsel, he moved to dismiss the charge on speedy trial grounds approximately 10 days before trial.

[¶47] Though Mr. Person asserted his right to a speedy trial, he did so sporadically, not vigorously. *Berry v. State*, 2004 WY 81, ¶ 45, 93 P.3d 222, 236 (Wyo. 2004) (weighing the third factor heavily in Mr. Berry's favor because he asserted his speedy trial right on eight separate occasions over two years); *Castellanos*, 2016 WY 11, ¶ 87, 366 P.3d at 1302-03 (weighing the third factor in Mr. Castellanos' favor because, early in the proceedings, defense counsel notified the court Mr. Castellanos would not waive his speedy trial right and then repeatedly asserted the right); *Cotney*, 2022 WY 17, ¶ 26, 503 P.3d at 67 (weighing the third factor heavily in Mr. Cotney's favor because it was undisputed he consistently asserted his speedy trial right). We accordingly give the third factor little weight in the speedy trial analysis. *See Vlahos*, 2022 WY 129, ¶ 59, 518 P.3d at 1072.

### 4. Prejudice

[¶48] The fourth *Barker* factor requires we consider whether the delay prejudiced Mr. Person. We assess prejudice "in the light of the 'interests that the speedy trial right was designed to protect.'" *Crebs*, 2020 WY 136, ¶ 45, 474 P.3d at 1148 (quoting *Tate*, 2016

WY 102, ¶ 39, 382 P.3d at 770); *Barker*, 407 U.S. at 532, 92 S.Ct. at 2193. "The interests that the speedy trial right was designed to protect are: (1) prevention of oppressive pretrial incarceration; (2) minimization of the accused's anxiety and concern; and (3) minimization of the possibility that a delay will hinder the defense." *Crebs*, 2020 WY 136, ¶ 45, 474 P.3d at 1148 (citing *Barker*, 407 U.S. at 532, 92 S.Ct. at 2193). We often shorthand these interests as "(1) lengthy pretrial incarceration; (2) pretrial anxiety; and (3) impairment of the defense." *Tate*, 2016 WY 102, ¶ 39 n.9, 382 P.3d at 770 n.9 (citation omitted). Mr. Person has "the burden 'to demonstrate and substantiate' he was prejudiced by the delay." *Crebs*, 2020 WY 136, ¶ 45, 474 P.3d at 1148 (quoting *Fairbourn*, 2020 WY 73, ¶ 57, 465 P.3d at 427). Though Mr. Person is not required to demonstrate prejudice to prevail on his speedy trial claim, we must consider the presence or absence of prejudice in the *Barker* analysis. *Webb v. State*, 2017 WY 108, ¶ 23, 401 P.3d 914, 924 (Wyo. 2017) (citation omitted). Moreover, if Mr. Person does not "demonstrate prejudice, the other three *Barker* factors must weigh heavily in his favor to establish a speedy trial violation." *Id.* (citation omitted).

[¶49] Mr. Person argues all three prejudice considerations weigh in his favor. We address each in turn, finding prejudice only as to the first.

Lengthy Pretrial Incarceration

[¶50] Prevention of oppressive pretrial incarceration is the second most important interest the speedy trial right was designed to protect. *Tate*, 2016 WY 102, ¶ 39, 382 P.3d at 771 (citing *United States v. Hicks*, 779 F.3d 1163, 1169 (10th Cir. 2015)); *Barker*, 407 U.S. at 532-33, 92 S.Ct. at 2193). Mr. Person's lengthy pretrial incarceration of 675 days undoubtedly impacted his relationships, employment, and finances, and thus gave rise to some degree of prejudice. *Castellanos*, 2016 WY 11, ¶ 89, 366 P.3d at 1303 (finding the record supported Mr. Castellanos' claim of prejudice related to his 910-day pretrial incarceration, "which undoubtedly resulted in a loss of relationships, employment, and assets"); *Lafferty v. State*, 2016 WY 52, ¶ 63, 374 P.3d 1244, 1255 (Wyo. 2016) ("Mr. Lafferty has shown that he suffered lengthy pretrial incarceration, as 811 days is indeed extensive."); *Sisneros v. State*, 2005 WY 139, ¶ 29, 121 P.3d 790, 800 (Wyo. 2005) (concluding Mr. Sisneros undoubtedly "suffered some prejudice as a result of the delay" in his case, as "his liberty was severely restricted and his extended incarceration necessarily affected his 'employment opportunities, financial resources and association' with family and friends" (citation omitted)).

Pretrial Anxiety

[¶51] Minimization of the accused's anxiety and concern is the least significant interest the speedy trial right was designed to protect. *Tate*, 2016 WY 102, ¶ 39, 382 P.3d at 771. Because a certain amount of pretrial anxiety exists in every criminal case, "a defendant must demonstrate extraordinary or unusual pretrial anxiety." *Id.* (citation omitted). Bare

assertions of anxiety are not enough. *Cotney*, 2022 WY 17, ¶ 28, 503 P.3d at 67 (citation omitted). Mr. Person has made only bare assertions of pretrial anxiety throughout these proceedings. He has not shown his anxiety was extraordinary or unusual. *Castellanos*, 2016 WY 11, ¶ 89, 366 P.3d at 1303 (noting Mr. Castellanos "point[ed] to detailed record support relating to his pretrial anxiety").

Impaired Defense

[¶52]  Minimizing the possibility that delay will hinder the defense is the most important interest the speedy trial right was designed to protect, as a "defendant's inability to adequately prepare and present his case can render a trial unfair." *Tate*, 2016 WY 102, ¶ 39, 382 P.3d at 770-71 (citation omitted). The inquiry focuses on "whether the delay resulted in a loss of evidence or impaired the defense by the 'death, disappearance, or memory loss of witnesses for the defense.'" *Cotney*, 2022 WY 17, ¶ 29, 503 P.3d at 68 (quoting *Castellanos*, 2016 WY 11, ¶ 90, 366 P.3d at 1303).

[¶53]  Mr. Person asserts witnesses had difficulty remembering certain information due to the amount of time that passed between when the charged incidents occurred in August and September 2019 and his trial in July 2021. He more specifically notes AP could not recall on which road the September 10 vehicle incident occurred, and Rodney Helgeson could not remember the date of the incident he testified about.

[¶54]  AP and Mr. Helgeson were the prosecution's witnesses, not defense witnesses. "When it is the *prosecution's* witnesses who have suffered memory losses, the State is prejudiced at least as much as, or more than, the defendant." *Fortner v. State*, 843 P.2d 1139, 1143 (Wyo. 1992).

> "[D]elay is a two-edged sword. It is the Government that bears the burden of proving its case beyond a reasonable doubt. The passage of time may make it difficult or impossible for the Government to carry this burden."

*Id.* (quoting *State v. Mouser*, 806 P.2d 330, 337 (Alaska Ct. App. 1991)). *See also Barker*, 407 U.S. at 521, 92 S.Ct. at 2187 (noting that "[a]s the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade" and "[i]f the witnesses support the prosecution, its case will be weakened, sometimes seriously so").

[¶55]  AP's inability to recall the precise road on which the September 10 vehicle incident occurred had minimal evidentiary impact. She remembered the general vicinity where it occurred, and there was no dispute it occurred in Laramie County. The police officer who responded to AP's 911 call testified the incident occurred in Laramie County as did Mr. Person. Moreover, Mr. Person used AP's imperfect recall to his advantage on

cross-examination by highlighting AP's inability to recall the precise road in an attempt to undermine her credibility. *Ridinger v. State*, 2021 WY 4, ¶ 23, 478 P.3d 1160, 1166 (Wyo. 2021) (noting the appellant took advantage of the victim's inability to recall certain details about the incident on cross-examination). He has not shown how AP's imperfect memory harmed his defense.

[¶56] Mr. Helgeson's testimony was also of minimal evidentiary import, as even the State acknowledged the incident he was going to testify about only "loosely relate[d] to [AP]." Mr. Helgeson was familiar with Mr. Person because his daughter was married to AP's brother. He testified about an incident where Mr. Person came to his home, "was very angry and agitated," and "was incoherent." He could not remember precisely when the incident occurred, suggesting it occurred in September 2019: "It was so long ago. It was, I think, sometime in September a couple years ago right before COVID. Sometime the fall before COVID, maybe. It's so long ago I don't remember exactly." Mr. Person himself cleared up any uncertainty when he testified the incident occurred within the charged timeframe. Here again, Mr. Person has not shown how Mr. Helgeson's imperfect memory impaired his defense.

[¶57] Mr. Person also argues his defense was impaired because pandemic-related jail restrictions hindered his ability to meet with trial counsel to prepare his defense. At least one court has recognized pandemic-related restrictions in a detention center might suffice to prove speedy trial prejudice under certain circumstances. *Ali v. Commonwealth*, 872 S.E.2d 662, 679 (Va. Ct. App. 2022). But that court rejected the appellant's prejudice argument because he failed to "articulate any *specific* way in which the . . . restrictions impaired his ability to present a defense." *Id.* Mr. Person's argument similarly fails.

[¶58] At pretrial conference on July 20, 2021, trial counsel complained that recent pandemic-related jail restrictions were limiting his ability to meet with Mr. Person to prepare for trial. The court ordered a hearing to address these concerns. At a hearing two days later, a deputy sheriff from the jail agreed to accommodate additional visitation time for trial counsel to meet with Mr. Person. Trial counsel agreed the proposed accommodations were reasonable. He raised no further concerns about his ability to meet with Mr. Person to prepare for trial. Mr. Person fails to show any specific impairment to his ability to present a defense.

[¶59] Considering the three interests the speedy trial right was designed to protect, we conclude the fourth *Barker* factor weighs only slightly in Mr. Person's favor, as he established some degree of prejudice due to his lengthy pretrial incarceration but no prejudice with respect to pretrial anxiety or impairment of his defense.

### 5. Balancing the Factors

[¶60]   Balancing the *Barker* factors, we hold there was no violation of Mr. Person's Sixth Amendment speedy trial right. Though the long delay weighs in Mr. Person's favor, none of the delay was attributable to the State. A small portion was attributable to Mr. Person changing counsel. The remainder of the delay was neutral, necessitated by a competency evaluation, placing the case back on the docket following the competency determination, and the extraordinary circumstances of the COVID-19 pandemic. Moreover, Mr. Person did not vigorously assert his right to a speedy trial. And, though he undoubtedly suffered some prejudice due to his lengthy pretrial incarceration, he failed to establish he suffered extraordinary pretrial anxiety or that his defense was impaired because of the delay. The prejudice factor therefore does not tip the scale in Mr. Person's favor.

[¶61]   Our inquiry in assessing Mr. Person's speedy trial claim is whether the delay substantially impaired his right to a fair trial. *Crebs*, 2020 WY 136, ¶ 50, 474 P.3d at 1149 (citation omitted). It did not. "The drastic remedy of dismissal with prejudice is not justified in this case." *Id.* at ¶ 49, 474 P.3d at 1149 (citation omitted).

## II.   *The district court did not commit reversible error by instructing the jury as it did.*

[¶62]   Mr. Person argues that the district court committed prejudicial error by instructing the jury that a stalking charge under Wyo. Stat. Ann. § 6-2-506(b) is a general intent crime. Proper jury instructions are a critical component of our criminal justice system.

> The function of jury instructions is to afford the jury with a foundational legal understanding to enable a reasoned application of the facts to the law. Two major principles of our system of justice are unwavering adherence to the rule of law, and trust in juries to resolve factual disputes. Correct instructions on the law are the thread that binds those two principles together. They make it possible for the jury to apply general rules of law enacted by the legislature or adopted by the courts to the particular case before it.

*Andersen v. State*, 2014 WY 88, ¶ 14, 330 P.3d 256, 260 (Wyo. 2014) (cleaned up).

[¶63]   Mr. Person objected to Instruction No. 14 at trial, and we therefore review for abuse of discretion. *Schuerman v. State*, 2022 WY 160, ¶ 7, 522 P.3d 145, 147 (Wyo. 2022) (citing *Niedlinger v. State*, 2021 WY 39, ¶ 41, 482 P.3d 337, 349 (Wyo. 2021)). We defer to the district court's tailoring of jury instructions unless the instruction does not correctly state the law. *Id.*

[¶64]   Instruction No. 14 stated:

> In the crime, Stalking, charged there must exist a connection between the act or conduct and general criminal intent.
>
> General criminal intent requires that the charged act is voluntarily taken, but it does not require any intention to violate the law or any intention to do a further act or achieve any further consequence, result, harm or injury from such act. When a person voluntarily does that which the law declares to be a crime, that person is acting with general criminal intent.

[¶65]   Instruction No. 15 correctly set forth the elements of stalking:

> The elements of the crime of Stalking, as charged in this case, are:
>
> 1. On or between August 8, 2019 to September 23, 2019
>
> 2. In Laramie County, Wyoming
>
> 3. The Defendant Kelly Person
>
> 4. With the intent to harass [AP]
>
> 5. While engaged in a course of conduct reasonably likely to harass [AP], another person
>
> 6. The Defendant committed the acts set forth in paragraphs 4 and 5 in violation of a condition of bail
>
> 7. If you find from your consideration of all the evidence that each of these elements has been proved beyond a reasonable doubt, then you should find the defendant guilty. If, on the other hand, you find from your consideration of all the evidence that any of these elements has not been proved beyond a reasonable doubt, then you should find the defendant not guilty.

## A. Abuse of Discretion

[¶66] Mr. Person argues the district court abused its discretion by giving Instruction No. 14 because it described stalking as a general intent crime when it in fact requires specific intent. We agree.

[¶67] General intent crimes are different from specific intent crimes. When a crime's definition "consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence the fact that the defendant intended to do the proscribed act makes that crime a general criminal intent offense." *Kite v. State*, 2018 WY 94, ¶ 23, 424 P.3d 255, 263 (Wyo. 2018) (citation omitted). In contrast, when a statute "refers to [the] defendant's intent to do some further act or achieve some additional consequence, the crime is deemed to be one of specific intent." *Id.* (citation omitted). It is more difficult for the State to prove specific intent than general intent. *Simmons v. State*, 674 P.2d 1294, 1297 (Wyo. 1984), *superseded by statute on other grounds as stated in Cox v. State*, 829 P.2d 1183 (Wyo. 1992).

[¶68] It is unnecessary to instruct the jury on the difference between a general intent crime and a specific intent crime and, in fact, these instructions should not be given due to their "vagueness and general failure to enlighten juries." *Wyant v. State*, 2020 WY 15, ¶ 10, 458 P.3d 13, 18 (Wyo. 2020) (quoting *Compton v. State*, 931 P.2d 936, 941 (Wyo. 1997)); *Black v. State*, 2020 WY 34, ¶ 46, 458 P.3d 1245, 1256 (Wyo. 2020); *Keats v. State*, 2003 WY 19, ¶ 13, 64 P.3d 104, 108 (Wyo. 2003). "[I]t is more important that the jury understand what exactly they are required to determine." *Dennis v. State*, 2013 WY 67, ¶ 40, 302 P.3d 890, 898 (Wyo. 2013) (quoting *Keats*, 2003 WY 19, ¶ 13, 64 P.3d at 108).

[¶69] Wyoming's stalking statute describes a specific intent crime, as it required the State to prove Mr. Person intended to harass AP. *See* Wyo. Stat. Ann. § 6-2-506(b) (LexisNexis 2021) (stating "a [defendant] commits the crime of stalking if, with intent to harass another person, the [defendant] engages in a course of conduct reasonably likely to harass that person"); *Dean v. State*, 2014 WY 158, ¶ 10, 339 P.3d 509, 512 (Wyo. 2014) ("Section 6-2-506(b) requires a specific intent to harass." (citation omitted)).

[¶70] Because stalking is a specific, not general intent crime, the State concedes Instruction No. 14 failed to accurately state the law and should not have been given. We agree and conclude the district court abused its discretion by giving it. *See Schuerman*, 2022 WY 160, ¶ 19, 522 P.3d at 150.

## B. Prejudice

[¶71] The failure to properly instruct the jury on elements of a crime is trial error, rather than structural error; therefore, the Appellant must demonstrate prejudice to establish

reversible error. *See Walker v. State*, 2022 WY 158, ¶ 17, 521 P.3d 967, 976 (Wyo. 2022) (*Walker III*) (requiring a finding of prejudice). In *Shull v. State*, 2017 WY 14, ¶ 45, 388 P.3d 736, 774 (Wyo. 2017), *overruled by Schmuck v. State*, 2017 WY 140, 406 P.3d 286 (Wyo. 2017) the jury instructions in a first-degree murder case did not require the State to prove the defendant did not act in the sudden heat of passion, which was error. We analyzed the proper standard of review and distinguished structural error from trial error as "a defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Id.* at ¶ 43, 388 P.3d at 773. Structural error is an error so grave and fundamental that it requires automatic reversal, without regard to prejudice. *Yazzie v. State*, 2021 WY 72, ¶ 13, 487 P.3d 555, 560 (Wyo. 2021) (quoting *Neder v. United States*, 527 U.S. 1, 7, 119 S.Ct. 1827, 1833 (1999)). We held that the improper jury instruction shifted the burden to disprove sudden heat of passion and affected the framework of the trial so severely the error was structural. *Shull*, 2017 WY 14, ¶ 45, 388 P.3d at 774.

[¶72]  We overruled that holding just months later. In *Schmuck*, as in *Shull,* this Court found the district court erred by not instructing the jury during a first-degree murder trial that the State must prove, beyond a reasonable doubt, the defendant did not act in the sudden heat of passion. *Schmuck*, 2017 WY 140, ¶ 22, 406 P.3d at 293-94. But we concluded the failure to properly instruct on one element of a crime was a trial error requiring a showing of prejudice, not structural error. *Id.* at ¶ 31. 406 P.3d at 297; *see also Granzer v. State*, 2008 WY 118, ¶ 18, 193 P.3d 266, 271-72 (Wyo. 2008); *Farrow v. State*, 2019 WY 30, ¶ 12, 437 P.3d 809, 815 (Wyo. 2019). We held that instructing "the jury on an essential element of an offense is not part of the limited class of fundamental constitutional errors so intrinsically harmful as to require automatic reversal . . . without regard" to prejudice. *Schmuck,* 2017 WY 140, ¶ 31, 406 P.3d at 297 (quoting *Granzer*, 2008 WY 118, ¶ 15, 193 P.3d at 271).

[¶73]  "Prejudice is not presumed[,] and the burden is on the appellant to demonstrate it."[4] *Merit Energy Co. v. Horr*, 2016 WY 3, ¶ 23, 366 P.3d 489, 497 (Wyo. 2016); *Rodriguez v. State*, 2022 WY 109, ¶ 26, 516 P.3d 850, 855 (Wyo. 2022) (citing *Armajo v. State*, 2020 WY 153, ¶ 33, 478 P.3d 184, 193 (Wyo. 2020)). "To the extent our past decisions have suggested otherwise, we clarify that the existence of [] error and whether the error is prejudicial requiring reversal of the conviction are two separate matters." *Walker III*, 2022 WY 158, ¶ 57, 521 P.3d at 985 (citing *State v. Escobar*, 523 S.W.3d 545, 551 (Mo. Ct. App. 2017)).

---

[4] Federal law differs from Wyoming law and places the burden on the government to prove beyond a reasonable doubt that the jury instruction error was harmless. *United States v. Kahn*, 58 F.4th 1308, 1318 (10th Cir. 2023); *United States v. Holly*, 488 F.3d 1298, 1307 (10th Cir. 2007).

[¶74] "Jury instructions shall not be ruled defective absent a showing that the instructions confused or misled the jury as to the proper principles of law *and* prejudiced the defendant." *Walker III*, 2022 WY 158, ¶ 17, 521 P.3d at 976 (quoting *Baker v. State*, 2010 WY 6, ¶ 31, 223 P.3d 542, 555 (Wyo. 2010)) (emphasis added); *Schuerman*, 2022 WY 160, ¶ 7, 522 P.3d at 148. If jury instructions are incorrect, "we recognize the error and continue to determine whether the defendant was prejudiced after considering the record as a whole." *Walker III*, 2022 WY 158, ¶ 39, 521 P.3d at 980.

[¶75] To show reversible error Mr. Person must establish he had a reasonable probability of a more favorable outcome if the error had not been made. *See, e.g.*, *id.* at ¶ 66, 521 P.3d 987; *Anderson v. State*, 2022 WY 119, ¶ 27, 517 P.3d 583, 592 (Wyo. 2022) ("An error is deemed prejudicial when there is a reasonable probability that, in the absence of the [error], the verdict would have been more favorable to the appellant." (quoting *Swett v. State*, 2018 WY 144, ¶ 12, 431 P.3d 1135, 1140 (Wyo. 2018))); *Mitchell v. State*. 2020 WY 142, ¶ 21, 476 P.3d 224, 232 (Wyo. 2020); *Pina v. Christensen*, 2009 WY 64, ¶ 7, 206 P.3d 1298, 1300 (Wyo. 2009) ("To measure the degree of prejudice, jury instructions are viewed in the light of the entire trial, including the allegations of the complaint, conflict in the evidence on critical issues[,] and the arguments of counsel." (citing *City of Cheyenne v. Simpson*, 787 P.2d 580, 581-82 (Wyo. 1990))). A number of factors emerge from our cases addressing the impact of an improper jury instruction, and those factors guide our analysis.

## C. Factors

### 1. Evidence Jury was Misled or Confused

[¶76] Improper or conflicting jury instructions have the potential to mislead or confuse a jury and thus may weigh in favor of finding prejudice. *See Schuerman*, 2022 WY 160, ¶ 19, 522 P.3d at 150; *Kite*, 2018 WY 94, ¶¶ 32-33, 424 P.3d at 264-65. We do not presume prejudice and instead look to the record as a whole to determine if the jury was misled or confused. *Rodriguez*, 2022 WY 109, ¶ 26, 516 P.3d at 855 (citing *Armajo*, 2020 WY 153, ¶ 33, 478 P.3d at 193); *but see Walker III*, 2022 WY 158, ¶¶ 68-69, 521 P.3d at 987.

[¶77] In *Walker III*, the defendant was charged with five counts of third-degree sexual abuse of a minor and one count of attempted second-degree sexual abuse of a minor. *Id.* at ¶ 1, 521 P.3d at 969. The five counts of third-degree sexual abuse of a minor were not distinguished from one another in the verdict form and the jury convicted the defendant of Counts I, II, and III. *Id.* at ¶¶ 13, 15, 521 P.3d at 975. Testimony and closing arguments clarified that Count I related to the second time the defendant walked into the victim's bedroom but muddled Counts II-V and did not clearly distinguish each count factually. *Id.* at ¶¶ 66-67, 521 P.3d at 987. The jury's conviction on only three of the five counts further raised concern about which incidents the jury convicted the defendant on.

19

*Id.* We concluded that the defendant established prejudice because there was a reasonable probability the jury did not reach unanimity on the factual basis of each charge. *Id.* at ¶¶ 66- 68, 521 P.3d at 987.

[¶78] The Court reached a different result in *Morones v. State*, where the defendant was charged with two counts of strangulation of a household member. 2020 WY 85, ¶ 6, 466 P.3d 300, 303 (Wyo. 2020). The jury instructions and verdict form for both counts were identical, and the jury convicted the defendant on one count of strangulation of a household member. *Id.* at ¶ 16, 466 P.3d at 305. The defendant argued on appeal his conviction lacked sufficient evidence because the verdict form did not distinguish between the two charges and risked a non-unanimous verdict. *Id.* We affirmed his conviction because the parties consistently referred to the events sequentially and the charges were sufficiently distinguished at trial, reducing the potential for jury confusion or lack of unanimity. *Id.* at ¶ 18, 466 P.3d at 306.

[¶79] Mr. Person's case is more like *Morones* than *Walker III*. The issue in *Walker III* was the reasonable probability that, based on the record and the number of indistinguishable counts, the jury did not reach a unanimous verdict on each count. 2022 WY 158, ¶¶ 67-69, 521 P.3d at 987. Reviewing the entire record, Mr. Person cannot demonstrate the jury was confused or misled simply by the improper general intent instruction. *See Morones*, 2020 WY 85, ¶ 6, 466 P.3d at 303; *Rodriguez*, 2022 WY 109, ¶ 26, 516 P.3d at 855 (citing *Armajo*, 2020 WY 153, ¶ 33, 478 P.3d at 193).

[¶80] In *Schuerman*, we held the district court abused its discretion by instructing the jury that the defendant could be convicted of attempted aggravated assault and battery if he "knowingly" or "intentionally" attempted to cause serious bodily injury despite the crime requiring specific intent. 2022 WY 160, ¶ 5, 522 P.3d at 146-47. We did not presume that the improper "knowingly" instruction misled the jury and caused prejudice. Instead, we relied on the special verdict form which clearly demonstrated the jury convicted the defendant under the knowingly option. *Id.* at ¶ 19, 522 P.3d at 150. We concluded the jury's conviction lacked a legally sufficient basis and reversed. *Id.* at ¶¶ 5, 11, 19, 522 P.3d at 146-147, 149, 150.

[¶81] In *Kite*, the jury was given a special verdict form that allowed it to convict the defendant of an attempt crime under several different mens rea standards, when only specific intent was legally sufficient. 2018 WY 94, ¶¶ 10, 33, 424 P.3d at 259-60, 265. The jury convicted the defendant and selected "the defendant acted intentionally, knowingly, and recklessly." Despite the improper mens rea instruction, we were satisfied the jury convicted the defendant upon a legally sufficient basis because the special verdict form reflected that the jury found he acted intentionally. *Id.* at ¶ 34, 424 P.3d at 265. We required the defendant to show more than simply an incorrect jury instruction to prove prejudice.

[¶82]   We have also considered the presence or absence of jury questions when weighing jury confusion. *See, e.g.*, *Morones*, 2020 WY 85, ¶ 18, 466 P.3d at 306 ("[T]here was no unanswered jury question, and it does not appear the jury was confused."); *Gentilini v. State*, 2010 WY 74, ¶ 23, 231 P.3d 1280, 1287 (Wyo. 2010) ("The jury did not ask questions or otherwise indicate confusion regarding any other instruction."); *Heywood v. State*, 2007 WY 149, ¶ 29, 170 P.3d 1227, 1235 (Wyo. 2007) ("[J]ury questions revealing confusion or a lack of understanding should be answered.") *abrogated on other grounds*; *Vaught v. State*, 2016 WY 7, ¶ 37, 366 P.3d 512, 520 (Wyo. 2016) ("The jury's note identified nothing defective or confusing about the original instructions, and . . . one cannot tell whether the jury wanted a clarification of the law or some guidance as to how the facts in evidence might relate to that law."). The jury did not ask any questions relating to the intent element of stalking, suggesting a lack of jury confusion, and making it less likely Mr. Person would have had a more favorable outcome without Instruction No. 14.

[¶83]   A special verdict form was not used in this case, so unlike in *Schuerman*, there is no clear indication the jury was misled or confused. And there were no jury questions that could suggest confusion. This factor therefore weighs against a finding of prejudice.

### 2.   Correct Instructions Clarifying Jury's Task

[¶84]   The next factor is whether the jury instructions contained a proper instruction that helped clarify any confusion the improper instruction caused. *Duke v. State*, 2004 WY 120, ¶ 92, 99 P.3d 928, 955 (Wyo. 2004); *Walker v. State*, 2012 WY 1, ¶ 11, 267 P.3d 1107, 1111 (Wyo. 2012) (*Walker I*); *Willoughby v. State*, 2011 WY 92, ¶ 11, 253 P.3d 157, 161 (Wyo. 2011) ("We have said many times that a trial error may be corrected by an appropriate curative instruction[.]"). Prejudice from an improper instruction can be cured if an additional instruction conveys "correct information to the jury in a clear and concise manner so that it is unlikely that an erroneous impression would remain in the minds of the jurors." *Duke*, 2004 WY 120, ¶¶ 95-96, 99 P.3d at 955 (quoting *Christian v. State*, 883 P.2d 376, 379 (Wyo. 1994)); *see also Walker III*, 2022 WY 158, ¶ 57, 521 P.3d at 985-86 (clarifying that curative instructions are analyzed under the prejudice prong and cannot cure trial error).

[¶85]   The court told the jury, in Instruction No. 2, it must consider all the instructions and could not ignore any of them:

> If in these instructions any rule, direction or idea is stated in varying ways, no emphasis is intended, and none must be inferred by you. For that reason, you are not to single out any certain sentence, or any individual point or instruction, and ignore the others. You are to consider all the

21

instructions as a whole, and are to regard each in light of all the others. The order in which the instructions are given has no significance as to their relative importance.

[¶86]  The court also instructed the jury on the importance of the elements of the crime: "[i]n order to convict the defendant of the crime charged, every material and necessary element to constitute such a crime must be proved beyond a reasonable doubt"; and "[t]he burden is always on the State to prove the defendant's guilt beyond a reasonable doubt as to each element of the offense." After the court misinformed the jury in Instruction No. 14 that stalking is a general intent crime, it correctly instructed the jury, in Instruction No. 15, that one of the elements of the crime of stalking was "the intent to harass [AP]."

[¶87]  In *Duke*, we addressed a similar issue of conflicting jury instructions. The court gave erroneous elements instructions on each of two counts of first-degree murder, with both instructions stating, "If you find from your consideration of all the evidence that *any* of these elements has been proved beyond a reasonable doubt, then you should find the defendant guilty." *Duke*, 2004 WY 120, ¶ 92, 99 P.3d at 955 (emphasis added). We held that, even if the jury was confused or misled by these instructions, two other instructions clearly articulated it was the State's burden to prove every element of their case and sufficiently described the jury's task. *Id.* at ¶ 96, 99 P.3d at 955-56 (citing *Rigler v. State*, 941 P.2d 734, 741 (Wyo. 1997)). The instructions continued, if "you find from your consideration of all the evidence that *each* of these elements has not been proved beyond a reasonable doubt, then you should find the defendant not guilty." *Id.* at ¶ 96, 99 P.3d at 955 (emphasis added). We consider jury instructions as a whole, not in isolation, to determine if they were legally sufficient and adequately instructed the jury. *Id. at* ¶ 90, 99 P.3d at 954 (citing *Black v. State*, 2002 WY 72, ¶ 5, 46 P.3d 298, 300 (Wyo. 2002)); *Walker III*, 2022 WY 158, ¶ 39, 521 P.3d at 980; *Daves v. State*, 2011 WY 47, ¶ 12, 249 P.3d 250, 255 (Wyo. 2011). Considering the instructions together, we concluded in *Duke* that the defendant failed to show the jury was misled into believing he could be convicted of first-degree murder if any one element was proved beyond a reasonable doubt. 2004 WY 120, ¶ 98, 99 P.3d at 956.

[¶88]  In *Walker I*, the judge verbally instructed the jury improperly on seven occasions on the burden of proof for a particular element of stalking. *Walker I*, 2012 WY 1, ¶ 4, 267 P.3d at 1109. The jury was given a conflicting written instruction regarding the element and a proper elements instruction, and then heard conflicting closing arguments about the same element. *Id.* at ¶¶ 11-12, 267 P.3d at 1111-12. We weighed the number of times the jury was verbally instructed on the issue, the confusing written instruction, and counsel's closing statement against the correct elements instruction. We determined the elements instruction, in that instance, could not, on its own, remedy the confusion and give adequate legal guidance. *Id.* at ¶ 11, 267 P.3d at 1111.

22

[¶89]   In contrast, although Instruction 14 should not have been given, Instruction 15 was a clear and concise direction to the jury to determine whether Mr. Person acted with the intent to harass AP. Considering the clarity of the instruction, it is not probable that the jury was left with an erroneous impression that Mr. Person need only have acted voluntarily. In light of Instruction 15, jury confusion in this instance is less likely to have occurred and this factor weighs against a finding of prejudice.

### 3.   Overwhelming Weight of the Evidence

[¶90]   The weight of the evidence against a defendant is a critical factor in the Court's determination of prejudice. *See, e.g.*, *Walker v. State*, 2013 WY 58, ¶¶ 33-34, 302 P.3d 182, 192-93 (Wyo. 2013) (*Walker II*) (determining evidence against the defendant was not so overwhelming as to negate a finding of prejudice); *Walker III*, 2022 WY 158, at ¶¶ 66-68, 521 P.3d at 987; *Schmuck*, 2017 WY 140, ¶¶ 35-36, 406 P.3d at 298-99; *Klingbeil v. State*, 2021 WY 89, ¶ 38 n.3, 492 P.3d 279, 287 n.3 (Wyo. 2021).

[¶91]   In *Walker II*, the jury was incorrectly instructed that it could find the defendant had the specific intent to harass if he engaged in certain enumerated acts. 2013 WY 58, ¶¶ 16, 33, 302 P.3d at 186, 192. The defendant argued he did not possess the requisite intent to harass his ex-wife. He asserted his encounter with his ex-wife at Walmart was accidental, that he was shopping for electronics and only saw the back of her head and did not know it was her. *Id.* at ¶ 34, 302 P.3d at 192. This Court disagreed with the State that the evidence of the defendant's guilt was overwhelming, and therefore concluded that Mr. Walker had established the incorrect jury instructions prejudiced him. *Id.* at ¶ 34, 302 P.3d at 192-93.

[¶92]   In *Klingbeil*, we analyzed whether a doctor's improper testimony that the victim's cause of death was homicide caused prejudice in a first-degree murder trial. 2021 WY 89, ¶ 39, 492 P.3d at 288 (analyzing the same overwhelming evidence factor as used in improper jury instruction analysis). This Court considered testimony from multiple witnesses, weighed the defendant's own conflicting statements in and out of court, and other unrefuted evidence. *Id.* at ¶¶ 47-48, 492 P.3d at 289. We determined that it was not reasonably probable the defendant would have received a more favorable outcome without the improper evidence and the overwhelming evidence weighed against a finding of prejudice. *Id.* at ¶ 49, 492 P.3d at 289.

[¶93]   In this case, the jury was required to find Mr. Person intended to harass AP. The definition of harass means "to engage in a course of conduct . . . directed at a specific person that the defendant knew *or should have known* would cause a reasonable person . . . emotional distress . . . fear for their safety . . . [or] fear for the destruction of property." Wyo. Stat. Ann. § 6-2-506 (LexisNexis 2021) (emphasis added).

[¶94] The evidence of Mr. Person's intent was overwhelming. AP recounted at least nine instances of harassment over the course of the month leading up to the stalking charge. The evidence showed Mr. Person:

- repeatedly emailed her;

- repeatedly called her obscene names;

- yelled obscenities in front of her at her daughter's elementary school;

- told her to live in fear;

- followed her vehicle while wearing a disguise, behavior that was sufficiently frightening that their children screamed and called 911;

- told her that their children would have to grow up without a mom or dad;

- disabled her vehicle;

- destroyed and stole her personal belongings;

- threatened to torture a man he believed she was involved with; and

- in a telephone conversation with AP's employer, he threatened to come to AP's workplace and kill her.

Mr. Person admitted that AP blocked his number, and he was advised by counsel not to contact AP, and yet he persisted in this conduct.

[¶95] Even against Mr. Person's denials and attempts to explain some of his actions, the evidence was overwhelming that he engaged in a course of conduct that he knew or should have known would cause AP emotional harm or fear for her safety. There is no reasonable probability he would have received a more favorable outcome without Instruction No. 14, which weighs against a finding of prejudice.

### 4. Closing Arguments

[¶96] Closing arguments alone cannot cure improper jury instructions; however, they are a factor that can be weighed to assist in analyzing prejudice. *Walker I*, 2012 WY 1, ¶ 12, 267 P.3d at 1111-12; *Walker III*, 2022 WY 158, ¶ 65, 521 P.3d at 987 ("[We] have considered clarifying statements in closing argument when affirming a conviction based on ambiguous instructions." (citing *Gentilini*, 2010 WY 74, ¶ 24, 231 P.3d at 1287-88)); *Duke*, 2004 WY 120, ¶ 97, 99 P.3d at 956 (holding that the prosecution's reminder to the

jury during closing that the State must prove each element of its case beyond a reasonable doubt was a factor to consider when determining if the defendant was prejudiced by improper burden of proof jury instructions). Both parties made clear in closing that intent was at issue.

[¶97]   The State in closing summarized its burden stating "Now, the State needs to prove that . . . Defendant Kelly Person with the intent to harass [AP] . . . engaged in a course of conduct reasonably likely to harass[.]" The State then pointed the jury to the improper general intent instruction but did not overly emphasize it, unlike *Walker I*, 2012 WY 1, ¶ 11, 267 P.3d at 1111. The State immediately told the jury, "if you're wondering, well, jeez did he really try to harass [AP], read that email from the middle of September. It makes it perfectly clear the state of mind Kelly Person is in[.]" The State made no other references to general intent.

[¶98]   Mr. Person's attorney also focused on specific intent in closing. Defense counsel discussed specific intent, saying, "Let's take a look at a couple of the statements that the State believes show this mental state, this intent to harass." He then rehashed several instances of conduct presented at trial and discussed Mr. Person's mental state and how his goal was to have contact with his kids, rather than to intentionally harass his ex-wife.

[¶99]   Closing arguments clarified that the issue was whether Mr. Person acted with the specific intent to harass AP. This factor weighs against a determination of jury confusion and of prejudice.

**D. Weighing the factors together, Mr. Person did not meet his burden to establish prejudice.**

[¶100] Mr. Person did not meet his burden to prove prejudice. Nothing occurred that would suggest jury confusion, and the elements instruction was a clear and accurate statement of the law and the jury's task. There was overwhelming evidence against Mr. Person, and closing arguments focused on and clarified the specific intent requirement. Based on the combination of these factors, we conclude that Mr. Person has not shown a reasonable probability of a more favorable outcome absent Instruction No. 14.

*CONCLUSION*

[¶101] Mr. Person was not denied his right to a speedy trial. Although the district court abused its discretion by giving Instruction No. 14, Mr. Person failed to meet his burden to establish prejudice. Affirmed.

**BOOMGAARDEN, Justice,** concurring in part and dissenting in part**,** in which **FENN, Justice,** joins.

[¶102] I concur with the majority opinion's holding in Part I.  However, I respectfully dissent from Part II because Mr. Person was prejudiced when the district court misled the jury by giving a general intent instruction for the specific intent crime of stalking.

[¶103] I agree with the majority that the district court's instruction on general intent is a trial error that "must be prejudicial to constitute reversible error."  *Schuerman v. State*, 2022 WY 160, ¶ 7, 522 P.3d 145, 148 (Wyo. 2022) (quoting *Schmuck v. State*, 2017 WY 140, ¶ 45, 406 P.3d 286, 301 (Wyo. 2017)); *Granzer v. State*, 2008 WY 118, ¶18, 193 P.3d 266, 271–72 (Wyo. 2008) ("[A] trial court's failure to instruct on an element of a crime is not a structural or fundamental error, but rather a trial error.").  Where I diverge from the majority is the prejudice standard to be applied given the nature of the error in this case.  The majority discerns, for the first time, a one-size-fits-all multi-factor prejudice standard for cases involving erroneous jury instructions.  I believe that approach is misguided and, for the following reasons, runs afoul of our precedent and the sanctity of the jury's role as the finder of fact.  *See e.g.*, *Schuerman*, ¶ 7, 522 P.3d at 147–48; *Walker v. State*, 2022 WY 158, ¶¶ 17, 55, 521 P.3d 967, 976, 985 (Wyo. 2022) (*Walker III*); *Walker v. State*, 2013 WY 58, ¶¶ 33–34, 302 P.3d 182, 192 (Wyo. 2013) (*Walker II*); *Walker v. State*, 2012 WY 1, ¶¶ 10–11, 267 P.3d 1107, 1111 (Wyo. 2012) (*Walker I*); *Giles v. State*, 2004 WY 101, ¶ 14, 96 P.3d 1027, 1031 (Wyo. 2004).

[¶104] It is well established "the concept of prejudice is defined in different ways depending on the context in which it appears."  *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1911, 198 L.Ed.2d 420 (2017).  We examine prejudice in this case in the context of an error whereby the trial court gave two mutually exclusive intent instructions that we must, on the record presented, presume the jury followed.  *See Walker III*, ¶ 69, 521 P.3d at 987; *Walker II*, ¶ 34, 302 P.3d at 192–93.

[¶105] As the majority acknowledged, "[p]roper jury instructions are a critical component of our criminal justice system."  *Supra*, ¶ 62.  This Court has explained "[t]he function of jury instructions is to afford the jury with a 'foundational legal understanding to enable a reasoned application of the facts to the law.'"  *Andersen v. State*, 2014 WY 88, ¶ 14, 330 P.3d 256, 260 (Wyo. 2014) (citation omitted); *see also Dennis v. State*, 2013 WY 67, ¶ 40, 302 P.3d 890, 898 (Wyo. 2013) ("[J]uries should be instructed as to the appropriate intent that is an element of the particular crime; it is more important that the jury understand what exactly they [are required] to determine[,]" than to attempt to distinguish between specific and general intent. (quoting *Keats v. State*, 2003 WY 19, ¶ 13, 64 P.3d 104, 108 (Wyo.2003))).  "Because the purpose of jury instructions is to provide guidance on the applicable law, prejudice will result when the instructions confuse or mislead the jury."  *Walker III*, ¶ 55, 521 P.3d at 985; *Schuerman*, ¶ 7, 522 P.3d at 148 (quoting *Neidlinger v. State*, ¶¶ 41–42, 482 P.3d 337, 349 (Wyo. 2021)); *Walker II*, ¶¶ 33–34, 302

P.3d at 192; *Walker I*, ¶¶ 10–11, 267 P.3d at 1111; *see also Giles*, ¶ 14, 96 P.3d at 1031 ("Prejudice will be determined to exist only where an appellant demonstrates that the instruction given confused or misled the jury with respect to the proper principles of law.").

[¶106] The root inquiry in the prejudice analysis is therefore whether the instructions, when viewed as a whole, and in the context of the entire trial, confused or misled the jury. *See e.g.*, *Schuerman*, ¶ 7, 522 P.3d at 147–48; *Walker III*, ¶¶ 17, 57, 521 P.3d at 976, 985; *Walker II*, ¶¶ 33–34, 302 P.3d at 192; *Walker I*, ¶¶ 10–11, 267 P.3d at 1111; *Giles*, ¶ 14, 96 P.3d at 1031. To help determine whether the instructions confused or misled the jury, we have considered, among other circumstances in the trial record, clarifying instructions, opening and closing arguments, and the evidence presented. *See e.g.*, *Walker III*, ¶¶ 66–69, 521 P.3d at 987 (considering the state's evidence and closing arguments to determine whether the jury was confused or misled); *Walker II*, ¶ 34, 302 P.3d at 192–93 (considering the defendant's testimony to find the state's evidence was not "overwhelming" and the jury was confused by the instructions); *Duke v. State*, 2004 WY 120, ¶¶ 95–98, 99 P.3d 928, 955–56 (Wyo. 2004) (considering whether a jury was confused or misled by an erroneous instruction when other instructions "clearly described the jury's task").

[¶107] Within that framework, the ultimate test is "whether the instructions leave no doubt as to the circumstances under which the crime can be found to have been committed." *E.g.*, *Kite v. State*, 2018 WY 94, ¶ 33, 424 P.3d 255, 265 (Wyo. 2018) (quoting *Blevins v. State*, 2017 WY 43, ¶ 26, 393 P.3d 1249, 1255 (Wyo. 2017)); *Walker II*, ¶ 31, 302 P.3d at 191 (quoting *Burnett v. State*, 2011 WY 169, ¶ 14, 267 P.3d 1083, 1087 (Wyo. 2011)); *Walker I*, ¶ 10, 267 P.3d at 1111 (citation omitted); *see also Dennis*, ¶ 36, 302 P.3d at 897. It is this ultimate consideration the majority's factor test sidesteps.

[¶108] I would conclude Instruction Nos. 14 and 15, when read together, cannot purge any doubt the jury may have convicted Mr. Person of stalking based on general intent. *See Keats*, ¶ 13, 64 P.3d at 108 (citation omitted). In applying Instruction No. 14, the jury had to determine whether there was "a connection between the act or conduct and general criminal intent," being told that general criminal intent, for the charged crime of "Stalking," "does not require any intention to violate the law or any intention to do a further act or achieve any further consequence, result, harm or injury from such act." Thus, in making this determination, the jury could find Mr. Person guilty regardless of whether he intended to achieve the consequence or result of harassing AP. Yet when applying Instruction No. 15, the jury could convict Mr. Person only if it determined the State proved, beyond a reasonable doubt, that Mr. Person specifically intended to harass AP. The jury was instructed it could not ignore any of the instructions given. Absent any evidence to the contrary, we must presume the jury did what it was told. *Fox v. State*, 2020 WY 88, ¶ 13, 467 P.3d 140, 143 (Wyo. 2020). Viewing the instructions as a whole, in the context of the entire trial, Instruction No. 14 irreconcilably obfuscated the intent to

27

harass element in Instruction No. 15 because it allowed the jury to convict Mr. Person based on a less culpable mental state. *See Kite*, ¶¶ 31–33, 424 P.3d at 264–65 (discussing the difference between general and specific intent).

[¶109] In considering the trial record, the court's and prosecutor's statements of the law to the jury amplified the erroneous general intent instruction, creating more doubt whether the jury convicted Mr. Person based on the proper principles of law. *See Andersen*, ¶ 19, 330 P.3d at 261–62 (finding the prosecutor's misstatements of the law in closing "amplified the erroneous instructions, which no doubt further 'confused or misled the jury with respect to the proper principles of law'"). As the majority recognized, the court abused its discretion by misstating the law. The State then exacerbated that misstatement in its closing argument by drawing the jury's attention to the intent to harass element and referring the jury specifically to Instruction No. 14—the general intent instruction.

[¶110] There are cases where the trial record has removed similar doubt. *See Kite*, ¶¶ 33–34, 424 P.3d at 265; *Schuerman*, ¶ 19, 522 P.3d at 150. However, the majority misapplies these cases to hold the jury was not misled by the erroneous general intent instruction. *Supra*, ¶¶ 80–81, 83. In *Kite*, the defendant was convicted of a specific intent crime after the jury was offered an instruction stating the defendant could be convicted for acting with any three states of mind—"[i]ntentionally [or] knowingly [or] recklessly[.]" *Kite*, ¶¶ 18, 34, 424 P.3d at 261–62, 265. We looked at the instructions as a whole and determined the jury was provided the "correct" state-of-mind option—"intentionally"—and that "the verdict form specifically asked the jury whether Mr. Kite's actions were [intentional] to which the jury responded in the affirmative." *Id.* ¶ 33, 424 P.3d at 265. We then held the instructions were adequate because "[they] gave the jury a correct and legally sufficient basis on which to convict Mr. Kite[.]" *Id.* ¶ 34, 424 P.3d at 265. Thus, in *Kite* the intent instruction and special verdict form, **together**, left no doubt as to the circumstances under which the defendant's crime can be found to have been committed. *See id.* ¶¶ 33–34, 424 P.3d at 265.

[¶111] In *Schuerman*, the jury was provided an erroneous general intent instruction for a crime requiring specific intent. *Schuerman*, ¶ 19, 522 P.3d at 150. The jury was also given a special verdict form allowing it to determine if the defendant acted "intentionally[,]" "knowingly[,]" or both. *Id.* The jury found the defendant acted "knowingly" but not "intentionally[.]" *Id.* Thus, reading the intent instruction and special verdict form together in *Schuerman*, we were unable to conclude the jury convicted the defendant on "a correct and legally sufficient basis[.]" *Id.* (citation omitted). The defendant's conviction was subsequently reversed. *Id.*

[¶112] Unlike *Kite* and *Schuerman*, the verdict form used in Mr. Person's trial was general, not specific. Because it required the jury only to state whether it found Mr. Person not guilty or guilty "as to the crime of Stalking," and did not include any special

interrogatories to indicate whether the jury found Mr. Person had the requisite specific intent to harass AP, the verdict form offers nothing in the way of a legally sufficient basis to uphold Mr. Person's conviction. We note the jury asked the court two questions during deliberations but neither concerned the jury instructions. Consequently, we do not know whether the jury convicted Mr. Person of stalking as a general intent crime—a crime that does not exist—or if it convicted him on the basis of proof he intended to harass AP.

[¶113] The majority's prejudice analysis hinges on emphasizing the weight of the State's evidence, which it describes as a "critical factor," to assert that the erroneous instruction did not prejudice Mr. Person. *Supra*, ¶ 90. However, none of the cases it cites supports the proposition that the weight of the state's evidence is a "critical factor" relevant in determining prejudice based on an erroneous intent instruction. *See Walker III*, ¶¶ 66–68, 521 P.3d at 987 (comparing the victim's testimony and state's closing arguments to the charged counts against the defendant, not to consider the weight of the evidence, but only to determine whether the jury could have reached a unanimous conclusion on each count); *Schmuck*, ¶¶ 35–37, 406 P.3d at 298–99 (considering the defendant's evidence and counsel's statements at opening and closing arguments, not to consider the weight of the evidence, but only to determine whether the defendant was prejudiced from the failure of the district court to provide the jury with a sudden heat of passion instruction); *Klingbeil v. State*, 2021 WY 89, ¶ 38 n.3, 492 P.3d 279, 287 n.3 (Wyo. 2021) (considering only whether the admission of evidence under W.R.E. 404(b) was prejudicial).

[¶114] The majority also relies on *Walker II*. *Supra*, ¶ 90–91. There, this Court stated it did not agree "the evidence of Appellant's guilt was 'overwhelming[.]'" *Walker II*, ¶ 34, 302 P.3d at 192. Instead of basing our holding on the weight of the evidence, we stated:

> More fundamentally, however, considering the fact that Jury Instruction No. 10 effectively relieved the State of the obligation to prove that Appellant acted with intent, **we are unable to conclude that the jury instructions left "no doubt as to the circumstances under which the crime can be found to have been committed."** *Burnett*, ¶ 14, 267 P.3d at 1087. Rather, we conclude that the instructions likely "confused or misled the jury with respect to the proper principles of law." [*Walker I*], ¶ 6, 267 P.3d at 1110. Accordingly, we find that Appellant was materially prejudiced[.]

*Walker II*, ¶ 34, 302 P.3d at 192–93 (emphasis added).

[¶115] The majority ultimately does not explain why there is "no doubt as to the circumstances under which the crime can be found to have been committed." *Id.* (citation omitted). It instead applies a multi-factor analysis, with emphasis on the weight of the State's evidence, to overlook the manifest doubt created by the erroneous general intent instruction given in this case. Here, nothing about the weight of the State's evidence goes to how the jury dealt with the irreconcilable instructions on the law of intent. The majority "cannot pretend to know what occurred in the jury room" without making factual findings on the State's evidence to presume the jury did not convict Mr. Person of stalking based on general intent. *Walker III*, ¶ 69, 521 P.3d at 987.

[¶116] "The sanctity of the jury's role as fact-finder has always been honored in this State." *Snow v. State*, 2009 WY 117, ¶ 29, 216 P.3d 505, 514 (Wyo. 2009). We have "consistently emphasized the principle that the jury—not the trial court and not the attorneys—resolves factual issues." *Widdison v. State*, 2018 WY 18, ¶ 21, 410 P.3d 1205, 1213 (Wyo. 2018) (citations omitted). Further, "[t]he aim of the guarantee of the right to trial by jury is to preserve . . . the concept that issues of law are to be resolved by the court and issues of fact are to be determined by the jury under appropriate instructions by the court[.]" *Id.* (quoting *Snow*, ¶¶ 29–30, 216 P.3d at 514). Thus, even if we agreed about the relative strength of the State's evidence to support Mr. Person's conviction, to consider the weight of that evidence under these circumstances would impermissibly supplant our knowledge of the law and judgment for that of the jury. *See Andersen*, ¶ 14, 330 P.3d at 260; *Widdison*, ¶ 21, 410 P.3d at 1213; *Snow*, ¶¶ 28–30, 216 P.3d at 514.

[¶117] For the reasons discussed, the intent instructions, viewed as whole in the context of the entire trial, "misled the jury with respect to the proper principles of law." *Walker II*, ¶ 34, 302 P.3d at 192–93 (quoting *Walker I*, ¶ 6, 267 P.3d at 1110); *Walker III*, ¶ 68, 521 P.3d at 987 ("It is entirely possible that a jury may not feel confused, especially if it has been *misled* by the instructions it was given." (emphasis in original)). Most important, the record in this case renders it impossible for us to conclude there is "no doubt as to the circumstances under which [Stalking] can be found to have been committed." *Walker II*, ¶ 34, 302 P.3d at 192 (citation omitted). Accordingly, I conclude Mr. Person was prejudiced by the erroneous general intent instruction and would reverse and remand for a new trial.